STATE of Wisconsin, Plaintiff-Appellant,

v.

Dhosi J. NDINA, Defendant-Respondent-Petitioner.

Supreme Court

*No. 2007AP5–CR. Oral argument October 8, 2008.
—Decided February 26, 2009.*

2009 WI 21

(Also reported in 761 N.W.2d 612.)

653

For the defendant-respondent-petitioner there were briefs by *Richard L. Kaiser* and the *Law Offices of Richard L. Kaiser*, Milwaukee, and oral argument by *Richard L. Kaiser*.

For the plaintiff-appellant the cause was argued by *Daniel J. O'Brien*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. The defendant, Dhosi J. Ndina, seeks review of a published decision of the court of appeals reversing an order of the Circuit Court for Milwaukee County, Dennis P. Moroney, Judge.[1] At the hearing on the defendant's postconviction motion for a new trial, the circuit court reversed a judgment of conviction against the defendant and granted the defendant's postconviction motion for a new trial.[2] The circuit court (Judge Moroney) concluded that the circuit court (Mary M. Kuhnmuench, Circuit Court Judge for Milwaukee County), had violated the defendant's right to a public trial under the Sixth Amendment to the United States Constitution by excluding the defendant's family from three days of the trial proceedings.

¶ 2. Three issues are presented on review to determine whether the circuit court erred in granting the defendant's postconviction motion for a new trial:

---

[1] *State v. Ndina*, 2007 WI App 268, 306 Wis. 2d 706, 743 N.W.2d 722.

[2] The defendant was convicted of first-degree recklessly endangering safety while using a dangerous weapon contrary to Wis. Stat. §§ 941.30(1) and 939.63 (2001–02).

I. Did the defendant waive or forfeit his right to argue in an appellate court that the circuit court violated his Sixth Amendment right to a public trial? Did the State waive or forfeit its right to argue in an appellate court that the defendant waived or forfeited his right to argue that the circuit court violated his Sixth Amendment right to a public trial?

II. Did the circuit court's order excluding family members from three days of trial proceedings violate the defendant's Sixth Amendment right to a public trial?

III. If the circuit court did not violate the defendant's Sixth Amendment right to a public trial, what remedy, if any, does the defendant have?

¶ 3. On appeal, the court of appeals concluded that by failing to object timely to the circuit court's order excluding his family from the trial proceedings, the defendant had waived or forfeited his right to argue the Sixth Amendment issue in his postconviction motion and on appeal. The court of appeals then evaluated the defendant's public trial argument in the context of determining whether the defendant had received ineffective assistance of trial counsel. The court of appeals concluded that the defendant's claim for ineffective assistance of counsel failed because the defendant had not demonstrated that his trial counsel's failure to object to the exclusion of his family prejudiced him. The court of appeals reversed the order granting the defendant a new trial.

¶ 4. Because both parties failed to bring arguments to the circuit court in a timely manner and have briefed the substantive issue whether the circuit court's order excluding family members violated the defendant's Sixth Amendment right to a public trial, this court has decided to reach the merits of the issue presented, rather

than to assess comparative blame and address the effect of the defendant's failure at trial to raise the Sixth Amendment issue and the State's failure at the postconviction hearing to raise the defendant's waiver/forfeiture at trial of the Sixth Amendment issue. We conclude that the exclusion of family members from three days of the trial implicated the defendant's Sixth Amendment right to a public trial but did not, under the circumstances of the instant case, violate the defendant's Sixth Amendment constitutional right.

¶ 5. We do not address whether the defendant is entitled to a new trial on any basis unrelated to the Sixth Amendment right to a public trial. We agree with the court of appeals that the matter is to be remanded to the circuit court for any additional postconviction proceedings required by law.

¶ 6. Accordingly, we affirm the court of appeals decision, although on different grounds, reversing the postconviction order granting the defendant a new trial, reinstating the judgment rendered by the jury, and remanding the matter to the circuit court for any additional postconviction remedies required by law. We remand the matter, as did the court of appeals, to the circuit court for additional postconviction proceedings required by law.

I

¶ 7. We briefly summarize the facts relating to the circuit court's order excluding members of the defendant's family from the courtroom for parts of the trial.

¶ 8. The State charged the defendant with attempted first-degree intentional homicide while using a dangerous weapon. The victim, the nephew of the

defendant, was stabbed twice in the back with a knife during a family gathering. The case was tried to a jury.

¶ 9. Because the victim is related to the defendant and was injured during a family gathering, many witnesses for both the State and the defendant were members of the defendant's family. Defense counsel's initial witness list included the names of 13 individuals whom the record shows either to be related to the defendant or at least to bear the same surname as a confirmed relative of the defendant. The State included seven of the defendant's relatives on its initial witness list, including three individuals who also appeared on defense counsel's witness list. Nine family members eventually testified either for or against the defendant.

¶ 10. The defendant and his family are fairly recent immigrants from Albania. The defendant relied upon an Albanian-English interpreter during the course of his trial. The record also shows that many, and possibly all, members of the defendant's family who served as witnesses testified in Albanian with an Albanian-English interpreter. Four police officers testified in English.

¶ 11. Early in the trial, the circuit court issued a sequestration order applying to all potential witnesses except the defendant and a law enforcement officer testifying for the State. The circuit court ordered all persons subject to the order to "remain outside the courtroom until called in to testify." The circuit court further ordered such persons "not to discuss their testimony with each other or with anyone until directed to do so or unless directed to do so by [the] Court."

¶ 12. The circuit court specifically instructed both the prosecutor and defense counsel to communicate its sequestration order to potential witnesses. The circuit court also reminded defense counsel that he would need

<br>

to utilize the services of an English-Albanian interpreter so that family members potentially testifying on the defendant's behalf could understand the circuit court's order.

¶ 13. On the trial's third day, the circuit court received testimony from the victim's father, who told the jury that he had witnessed the defendant stab his son. A disturbance occurred in the courtroom during this testimony. The circuit court observed that "individual family members in the gallery . . . were engaging in a level of conversation that not only the Court could hear" but that the circuit court "feared . . . the jury could hear as well." The circuit court stopped the proceedings and directed the bailiff and the court interpreter "to communicate to . . . those family members in the gallery that they must remain silent and not talk among each other while they are in the courtroom." The circuit court later observed that it had "not seen or heard anything from those family members in the gallery since that directive was made."

¶ 14. Near the end of the following day, the fourth day of trial, a second disturbance occurred as the victim's father continued to testify. The circuit court observed that there were people entering and leaving the courtroom and expressed concern about the sanctity of the circuit court's sequestration order. The prosecutor informed the circuit court that the victim's family had expressed concern that the persons entering and leaving the courtroom had been violating the order by conveying information to prospective witnesses. The circuit court asked defense counsel to identify three particular individuals in the gallery. Defense counsel identified these individuals as the defendant's mother and two of the defendant's sisters-in-law, at least one of whom was married to a person on defense counsel's witness list.

¶ 15. The circuit court issued an order "ban[ning] all family members from [the] court based on what [the court] believe[d] to be improper activities." The circuit court explained that its order was designed to "protect[] the integrity of [the] proceedings" and expressed particular concern about "those spouses who are married to potential witnesses in this case."

¶ 16. As an exception to its order, the circuit court permitted the defendant's mother to remain in the courtroom. The defendant swore in an affidavit that he filed with the circuit court that his mother does not speak English and therefore was unable to understand any of the witnesses who testified in English during his trial. The affidavit was not contradicted.

¶ 17. In excluding family members from the trial proceedings, the circuit court did not attempt to distinguish between those members of the defendant's family who were more closely related to the defendant and those who were more closely related to the victim. The circuit court expressly stated that its order would apply to family members on "both sides," with the single exception made for the defendant's mother. The circuit court also did not distinguish between those members of the defendant's family who were in the courtroom when the disturbances occurred and those members of the defendant's family who were not present. The order apparently applied as it was literally worded, that is, to "all family members."

¶ 18. The circuit court recounted the circumstances that led the circuit court to issue its order excluding family members from the courtroom. The circuit court observed that the defendant's mother "had already demonstrated a willingness to talk about the case to someone sitting next to her while she was in [the]

gallery" on the day before. The circuit court further observed that "[t]here have been other family members that have been coming in and out and sitting and engaging in chitchat with each other while the trial is going on." The circuit court again expressed "serious concerns" that the "spirit" of its sequestration order was being violated.

¶ 19. The next day, the circuit court again explained the basis of its order excluding family members from the courtroom. The circuit court stated that it could not "allow what [it] believe[d] to be a violation of [its] earlier ruling [imposing the sequestration order] to go unchecked." The circuit court stated that it had observed "the mother of the defendant, as well as other family members, both male and female . . . discussing matters as witnesses were on the stand, oftentimes in a very animated and elevated fashion." The circuit court further stated that family members in the audience had been "nodding in approval or disapproval of witnesses' testimony, in full view of the jury" and were "loud, loud enough such that other members of my staff, as well as the parties, could hear it."

¶ 20. Defense counsel did not object to the circuit court's order excluding family members from the courtroom. Neither the circuit court nor counsel for either side explicitly raised the possibility that the circuit court's order might implicate the Sixth Amendment right to a public trial.

¶ 21. The circuit court permitted family members to return to the courtroom at the beginning of the trial's eighth day to hear the jury instructions and the closing arguments of counsel. Altogether, family members were excluded from the courtroom for approximately three

days (the trial's fifth, sixth, and seventh days) of witness testimony.[3]

¶ 22. After his conviction, the defendant moved the circuit court to order a new trial. The defendant argued in principal part that the circuit court violated the defendant's Sixth Amendment right to a public trial when it excluded family members from the courtroom. The State did not argue at the postconviction hearing that the defendant had waived (or forfeited) his right to assert a violation of his Sixth Amendment right to a public trial.

¶ 23. The defendant also asserted in his postconviction motion that the circuit court had erred in

---

[3] Three members of the defendant's family stated in affidavits attached to the defendant's motion for postconviction relief that the circuit court's order had prevented them from attending portions of the defendant's trial. The defendant's brother and the defendant's sister's father-in-law each attested that "[i]f [he] had not been informed of the court's order, [he] would have attended at least a part of [the defendant's] trial." The defendant's sister-in-law (the same sister-in-law whom defense counsel identified at trial as the spouse of a person on defense counsel's witness list) attested that the circuit court had directly ordered her to leave the courtroom and that "[i]f [she] had not been ordered to leave, [she] would have remained that day and attended other days of the trial as well."

The defendant's postconviction counsel filed an affidavit stating that four additional members of the defendant's family indicated to counsel that the circuit court's order had prevented them from attending portions of the defendant's trial. Counsel listed an additional sister-in-law of the defendant, a father-in-law of one of the defendant's sisters, a person "related to the defendant by marriage," and an individual whose relation to the defendant was not specified in counsel's affidavit. Counsel did not state whether these family members were in the courtroom when the disturbances occurred that prompted the circuit court to exclude family members from the courtroom.

admitting certain witness testimony; that his counsel was ineffective for failing to object to the exclusion of family members from the trial, for failing to move for a mistrial, and for failing to object to certain portions of the State's closing arguments; and that a new trial should be granted on the basis of newly discovered evidence.[4]

¶ 24. The court of appeals reinstated the judgment of conviction against the defendant and remanded the cause to the circuit court for any additional postconviction proceedings required by law.

II

¶ 25. The first issue presented is waiver, that is, waiver by both the defendant and the State with regard to the claim that the defendant's Sixth Amendment right to a public trial was violated.

¶ 26. It is undisputed that defense counsel failed to object when the circuit court excluded family members from the courtroom. The State argues that because

---

[4] At the hearing on the postconviction motion, the circuit court did not reach these other issues raised in the defendant's motion for postconviction relief. The circuit court's order for a new trial on Sixth Amendment grounds obviated the need for the circuit court to address these additional issues.

Although the court of appeals addressed the defendant's argument that his defense counsel was ineffective for failing to object to the exclusion of family members from the trial, the court of appeals did not address the other issues and remanded them to the circuit court.

· The court of appeals concluded that trial counsel was not ineffective because the defendant had failed to show prejudice. In light of our holding that the defendant was not denied his Sixth Amendment right to a public trial, trial counsel's failure to object to the exclusion of witnesses does not constitute ineffective assistance of counsel.

defense counsel never objected to the circuit court's order excluding family members from the trial, the defendant waived or forfeited his right to argue that the circuit court violated the defendant's Sixth Amendment right to a public trial. The defendant vehemently disagrees with the State's position.

¶ 27. It is also undisputed that the State failed to argue in the postconviction hearing that the defendant had waived or forfeited the Sixth Amendment public trial issue. For his part, the defendant argues that because the State never raised in the postconviction hearing the issue of the defendant's waiver or forfeiture of his right to argue the violation of his Sixth Amendment right to a public trial, the State waived or forfeited its right to assert in this court that the defendant waived or forfeited his right to argue that the circuit court violated his Sixth Amendment right to a public trial. As might be expected, the State vehemently disagrees with the defendant's argument.

¶ 28. The case law is rife with confusion about the words "waiver" and "forfeiture." Indeed, this court repeatedly has acknowledged its own imprecise use of these words. *See Rao v. WMA Securities, Inc.*, 2008 WI 73, ¶ 24, 310 Wis. 2d 623, 752 N.W.2d 220 (acknowledging that "waiver" of the right of trial by jury under Article I, Section 5 of the Wisconsin Constitution sometimes "is more akin to 'forfeiture' than to 'waiver' in its strictest sense as an intentional relinquishment of a known right"); *State v. Kelty*, 2006 WI 101, ¶ 18 n.11, 294 Wis. 2d 62, 716 N.W.2d 886 (acknowledging that the "guilty-plea-waiver" rule could more accurately be called "the 'guilty-plea-forfeiture' rule, or something to that effect"); *State v. Huebner*, 2000 WI 59, ¶ 11 n.2, 235 Wis. 2d 486, 611 N.W.2d 727 (acknowledging that the rule of judicial administration known as the

"waiver" rule might better be labeled "the 'forfeiture rule,' because it refers to the forfeiture of a right by silence rather than the intentional relinquishment of a known right.").

¶ 29. Although cases sometimes use the words "forfeiture" and "waiver" interchangeably, the two words embody very different legal concepts. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quotation marks and citation omitted).

¶ 30. In other words, some rights are forfeited when they are not claimed at trial; a mere failure to object constitutes a forfeiture of the right on appellate review. The purpose of the "forfeiture" rule is to enable the circuit court to avoid or correct any error with minimal disruption of the judicial process, eliminating the need for appeal.[5] The forfeiture rule also gives both parties and the circuit court notice of the issue and a fair opportunity to address the objection; encourages attorneys to diligently prepare for and conduct trials; and prevents attorneys from "sandbagging" opposing counsel by failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal.[6]

¶ 31. In contrast, some rights are not lost by a counsel's or a litigant's mere failure to register an

---

[5] *See State v. Huebner*, 2000 WI 59, ¶ 11, 235 Wis. 2d 486, 611 N.W.2d 727.

[6] *See id.*, ¶¶ 11–12.

objection at trial. These rights are so important to a fair trial that courts have stated that the right is not lost unless the defendant knowingly relinquishes the right. As the court explained in *State v. Huebner*, 2000 WI 59, ¶ 14, 235 Wis. 2d 486, 611 N.W.2d 727, "a criminal defendant has certain fundamental constitutional rights that may only be waived personally and expressly," including "the right to the assistance of counsel, the right to refrain from self-incrimination, and the right to have a trial by jury. . . . Such rights cannot be forfeited by mere failure to object."

¶ 32. Similarly, the United States Supreme Court warned that "[a] strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial. . . . The Constitution requires that every effort be made to see to it that a defendant in a criminal case has not unknowingly relinquished the basic protections that the Framers thought indispensable to a fair trial." *Schneckloth v. Bustamonte*, 412 U.S. 218, 241, 242 (1973) (footnote omitted).

¶ 33. The court of appeals decision can be interpreted as concluding either that the defendant "waived" or that he "forfeited" his right to raise the merits of the alleged violation of his Sixth Amendment right to a public trial because he failed to object when the circuit court ordered his family members excluded.[7] Counsel

---

[7] *Ndina*, 306 Wis. 2d 706, ¶¶ 11–12 & n.1. The court of appeals stated that the defendant "waived" the right to assert his Sixth Amendment right to a public trial on appeal, citing *Levine v. United States*, 362 U.S. 610, 619 (1960), for this proposition. The court of appeals' parenthetical description of *Levine* states that "constitutional rights are waived or forfeited

for the State astutely pointed out during oral argument to this court, however, that the substance of the court of appeals' holding was that the defendant had "forfeited" rather than "waived" his Sixth Amendment right to a public trial. Consistent with the definition of "forfeiture," the court of appeals concluded that the defendant had no right to assert his Sixth Amendment right to a public trial in his postconviction motion or on appeal because the defendant had failed to assert this right timely at trial.[8]

¶ 34. Thus the court of appeals decision leaves open the question whether the defendant's failure to

by a defendant's or attorney's failure to object when the constitutional violation occurred." *Ndina*, 306 Wis. 2d 706, ¶ 11.

*Levine* involved criminal contempt proceedings. *See Levine*, 362 U.S. at 611. The *Levine* Court stated that "[p]rocedural safeguards for criminal contempts do not derive from the Sixth Amendment" because "[c]riminal contempt proceedings are not within 'all criminal prosecutions' to which [the Sixth] Amendment applies." *Id.* at 616. The *Levine* Court construed and applied the Fifth Amendment Due Process Clause, concluding that "[t]he continuing exclusion of the public in this case is not to be deemed contrary to the requirements of the Due Process Clause without a request having been made to the trial judge to open the courtroom at the final stage of the proceeding . . . ." *Id.* at 619. Neither "waive" nor "forfeit" (or any derivative of these words) appears in the *Levine* Court's opinion, although the concept of "waiver" is addressed in the dissent. *See id.* at 626 (Brennan, J., dissenting).

[8] The court of appeals relied on *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986), for the general proposition that an unobjected-to error must be analyzed under ineffective assistance of counsel standards, even when an error is of constitutional dimension. The court of appeals' reliance on *Kimmelman* is misplaced in the instant case. *Kimmelman* is more accurately described as applying specifically to Fourth Amendment errors on federal habeas review.

object at trial to closure on the ground of a violation of the Sixth Amendment constitutional right to public trial should be analyzed as a "waiver" or as a "forfeiture" of the defendant's right to raise the issue on appellate review.

¶ 35. The defendant and State dispute whether a "waiver" or "forfeiture" standard applies to a defendant's assertion of a violation of the right to a public trial. The case law is divided regarding whether a defendant's failure to object timely to a trial court's alleged violation of the right to a public trial should be analyzed under the waiver or forfeiture standard. Some cases conclude that before a defendant is held to have waived the Sixth Amendment right to a public trial, there must be an intelligent relinquishment of the known right.[9] Other cases conclude that a defendant loses (forfeits) the Sixth Amendment right to a public trial when the defendant or defense counsel fails to assert a timely objection at trial to the court's order of closure.[10]

---

[9] *See, e.g., Walton v. Briley*, 361 F.3d 431, 434 (7th Cir. 2004), ("[L]ike other fundamental trial rights, a right to a public trial may be relinquished only upon a showing that the defendant knowingly and voluntarily waived such a right."); *Hutchins v. Garrison*, 724 F.2d 1425, 1431 (4th Cir. 1983) ("A criminal defendant can waive his right to an open trial. Of course, a waiver of a constitutional right is effective only if it is an intentional relinquishment of a known right or privilege.") (quotations marks, citations, and footnote omitted); *Martineau v. Perrin*, 601 F.2d 1196, 1200 (1st Cir. 1979) ("It is . . . firmly established that a criminal defendant can waive his constitutional right to a public trial. We agree with petitioner that, since a constitutional right is involved, there had to be an intentional and knowing waiver.") (quotation marks and citations omitted).

[10] *See, e.g., United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006) ("Where a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a

¶ 36. The defendant and State also dispute whether the State may assert, as a matter of right, that the defendant has waived or forfeited his right to claim a violation of the Sixth Amendment. In other words, the parties disagree about whether the State has waived or forfeited its claim that the defendant waived or forfeited the Sixth Amendment argument.

¶ 37. The parties' statements of the deleterious effects of each other's alleged errors make sense. The State's brief explains that had the defendant objected timely before the circuit court to the exclusion of family members, the circuit court could have made a better record explaining its decision, could have narrowed its order, and could have considered alternative orders. The defendant's brief explains that had the State objected timely at the postconviction hearing that the defendant waived or forfeited his right to argue the violation of his right to a public trial, a better record would have been made in the circuit court, and multiple trips (as is now happening) between the circuit court, the court of appeals, and the supreme court could have been avoided.

¶ 38. Although two wrongs do not make a right, the circumstances in the present case make clear that this court should not spend time deciding this case

public trial."); *State v. Drummond*, 854 N.E.2d 1038, 1055 (Ohio 2006) (concluding that a defense "counsel's failure to object to the closing of the courtroom constitutes a waiver of the [Sixth Amendment] right to a public trial . . ."); *State v. Butterfield*, 784 P.2d 153, 157 (Utah 1989) (concluding that "the failure of a defendant and his or her counsel to object to a closure order constitutes waiver of the defendant's right to a public trial under . . . the sixth amendment to the United States Constitution . . . .").

674

either on the defendant's failure at trial to object timely to the exclusion of the family members or on the State's failure during the postconviction hearing to object to the defendant's lapse. The values protected by the forfeiture and waiver rules would not be protected in the instant case by applying a forfeiture or waiver rule to either the defendant or the State. Here both parties failed to make objections in a timely manner, but they have fully briefed the important substantive issue. This court should, under these circumstances, reach the merits of the issue presented, namely whether the circuit court's order violated the defendant's right to a public trial, rather than address whether either or both of the parties waived or forfeited their right to make certain arguments on review.

¶ 39. We therefore turn to the second issue, namely whether the circuit court's order excluding family members from several days of the trial violated the defendant's Sixth Amendment right to a public trial.

### III

■

¶ 40. The Sixth Amendment to the United States Constitution guarantees that a criminal defendant shall enjoy the right to a public trial. The Sixth Amendment provides in full as follows:

> In all criminal prosecutions, *the accused shall enjoy the right to a speedy* and *public trial*, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense (emphasis added).

¶ 41. The Sixth Amendment right to a public trial is applicable to the States through the Due Process Clause of the Fourteenth Amendment.[11]

¶ 42. The Sixth Amendment right to a public trial is an important constitutional safeguard of a fair criminal trial. The United States Supreme Court has stated that the Sixth Amendment right to a public trial " 'has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution' " and that " '[t]he knowledge that every criminal

---

[11] *See Duncan v. Louisiana,* 391 U.S. 145, 148 (1968) ("[M]any of the rights guaranteed by the first eight Amendments to the Constitution have been held to be protected against state action by the Due Process Clause of the Fourteenth Amendment. That clause now protects . . . the Sixth Amendment rights to counsel, [and] to a speedy and public trial . . . .") (footnotes omitted).

*See also In re Oliver,* 333 U.S. 257, 273 (1948) ("In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be deprived of his liberty without due process of law means at least that an accused cannot be thus sentenced to prison.").

The Wisconsin Constitution also provides an independent guarantee of the right to a public trial. *See* Wis. Const. art. I, § 7 ("In all criminal prosecutions the accused shall enjoy the right . . . to a speedy public trial . . . ."). The defendant in the present case, however, relies upon the Sixth Amendment.

Wisconsin Stat. § 757.14 (2005–06) provides that "[t]he sittings of every court shall be public and every citizen may freely attend the same, except if otherwise expressly provided by law . . . ." This case is a Sixth Amendment case, not a statutory case.

All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

676

trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on the possible abuse of judicial power.' "[12] The Sixth Amendment guarantee of a public criminal trial " 'is for the protection of all persons accused of crime—the innocently accused, that they may not become the victim of an unjust prosecution, as well as the guilty, that they may be awarded a fair trial . . . .' "[13] The public trial is premised on "[t]he principle that justice cannot survive behind walls of silence . . . ."[14]

¶ 43. If a defendant's right to a public trial is determined to have been violated, the defendant need not show prejudice; the doctrine of harmless error does not apply to structural errors.[15]

---

[12] *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979) (quoting *Oliver*, 333 U.S. at 270).

[13] *Id.* (quoting *Oliver*, 333 U.S. at 270 & n.25).

*See also Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (identifying the Sixth Amendment right to a public trial as one of the "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair"); *State v. Vanness*, 2007 WI App 195, ¶ 8, 304 Wis. 2d 692, 738 N.W.2d 154 ("The right to a public trial is a basic tenet of our judicial system . . . . [T]he public trial is 'the most effectual safeguard of testimony, and of the decisions depending on it; it is the soul of justice; it ought to be extended to every part of the procedure, and to all causes.' ") (quoting *Gannett Co.*, 443 U.S. at 422 (Blackmun, J., concurring in part and dissenting in part)) (internal quotation marks omitted).

[14] *Sheppard v. Maxwell*, 384 U.S. 333, 349 (1966).

[15] *See Neder v. United States*, 527 U.S. 1, 8 (1999) (listing "denial of [a] public trial" among errors deemed "to be 'structural,' and thus subject to automatic reversal"); *Johnson v. United States*, 520 U.S. 461, 468–69 (1997) (same); *Fulminante*,

¶ 44. A "presumption of openness" exists.[16] The right to a public trial is not, however, absolute. Despite a vast number of cases involving a myriad of fact situations exploring the Sixth Amendment right to a public trial, determining the contours of the right in a particular fact situation remains difficult.[17]

¶ 45. The parties' briefs do not clearly and directly set forth the standard of review an appellate court should use in reviewing a circuit court's decision regarding whether the defendant is entitled to a new trial

---

499 U.S. at 310 (same); *Waller v. Georgia*, 467 U.S. 39, 49–50 & n.9 (1984) (agreeing that "the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee because such a requirement "would in most cases deprive [the defendant] of the [public-trial] guarantee, for it would be difficult to envisage a case in which he would have evidence available of specific injury.") (alterations in original; quoted source omitted).

*See also State v. Ford*, 2007 WI 138, ¶ 43 and n.4, 306 Wis. 2d 1, 742 N.W.2d 61 (citing cases; characterizing the right to a public trial as a structural error subject to automatic reversal).

The question whether a constitutional error is susceptible to harmless-error analysis or rather is structural, requiring automatic reversal, should not be conflated with the question whether a constitutional right may be forfeited by timely failure to assert it or rather must be waived knowingly, voluntarily, and intelligently. The two inquiries, although related, are distinct.

[16] *Waller*, 467 U.S. at 45 (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984)).

[17] *Braun v. Powell*, 227 F.3d 908, 917 (7th Cir. 2000) ("Determining with any precision the contours of [the Sixth Amendment right to a public trial] is a difficult task. Existing case law, although setting the outer boundaries, gives comparatively little guidance with respect to 'gray areas.' ").

because the defendant's Sixth Amendment right to a public trial has been violated. We apply the standard of review set forth in *State v. Vanness*, 2007 WI App 195, ¶ 6, 304 Wis. 2d 692, 738 N.W.2d 154. In *Vanness*, the court of appeals concluded that the issue whether the Sixth Amendment right to a public trial was violated presents the application of constitutional principles to historical facts.[18] An appellate court upholds the circuit court's findings of evidentiary or historical fact unless those findings are clearly erroneous.[19] The appellate court determines the application of constitutional principles to those evidentiary or historical facts independently of the circuit court and court of appeals but benefiting from those courts' analyses.[20]

---

[18] *Vanness*, 304 Wis. 2d 692, ¶ 6 ("The only issue raised on appeal is whether . . . [the circuit court] violated Vanness's constitutional right to a public trial. This case requires us to apply the constitution to undisputed facts.").

[19] *State v. Sanders*, 2008 WI 85, ¶ 25, 311 Wis. 2d 257, 752 N.W.2d 713.

[20] *Vanness*, 304 Wis. 2d 692, ¶ 6 ("The application of constitutional principles to historical facts is a question of law reviewed without deference to the trial court.").

Although "it is within the discretion of a trial court in its inherent power to close a courtroom," *State ex rel. La Crosse Tribune v. Circuit Court for La Crosse County*, 115 Wis. 2d 220, 236, 340 N.W.2d 460 (1983) (not a Sixth Amendment case), according to the *Vanness* decision a circuit court errs as a matter of law if its closure order does not comport with the Sixth Amendment given the circuit court's supportable findings of historical fact.

The parties do not challenge the circuit court's authority to enter sequestration orders or to impose sanctions for the violation of such orders. The statutes recognize that a circuit court may exercise its discretion in deciding whether to enter a sequestration order or to impose sanctions for the violation of its orders. *See* Wis. Stat. § 906.15 and § 785.02.

¶ 46. An appellate court applies a two-step analysis to determine the question of law whether a defendant's Sixth Amendment right to a public trial has been violated. The appellate court first determines whether the closure at issue implicates the Sixth Amendment right to a public trial. If the closure does not implicate the Sixth Amendment right to a public trial, the appellate court need not reach the second step

---

Wisconsin Stat. § 906.15 provides in full as follows:

(1) At the request of a party, the judge or a circuit court commissioner shall order witnesses excluded so that they cannot hear the testimony of other witnesses. The judge or circuit court commissioner may also make the order of his or her own motion.

(2) Subsection (1) does not authorize exclusion of any of the following:

(a) A party who is a natural person.

(b) An officer or employee of a party which is not a natural person designated as its representative by its attorney.

(c) A person whose presence is shown by a party to be essential to the presentation of the party's cause.

(d) A victim, as defined in s. 950.02 (4), in a criminal case or a victim, as defined in s. 938.02 (20m), in a delinquency proceeding under ch. 938, unless the judge or circuit court commissioner finds that exclusion of the victim is necessary to provide a fair trial for the defendant or a fair fact-finding hearing for the juvenile. The presence of a victim during the testimony of other witnesses may not by itself be a basis for a finding that exclusion of the victim is necessary to provide a fair trial for the defendant or a fair fact-finding hearing for the juvenile.

(3) The judge or circuit court commissioner may direct that all excluded and non-excluded witnesses be kept separate until called and may prevent them from communicating with one another until they have been examined or the hearing is ended.

Wisconsin Stat. § 785.02 provides in full that "[a] court of record may imposed a remedial or punitive sanction for contempt of court under [chapter 785]."

of the analysis. If a closure implicates the Sixth Amendment right to a public trial, the appellate court then must determine whether the closure was justified under the circumstances of the case. This type of analysis has been used in some federal cases.[21]

¶ 47. In performing these two analytical steps in resolving the present case, we conclude (A) that the circuit court's order excluding family members from the courtroom implicates the Sixth Amendment right to a public trial, and (B) that the circuit court's order excluding family members was justified under the circumstances of the instant case.

A

¶ 48. Although the "exclusion of any spectator runs the risk of violating the Sixth Amendment and, accordingly, of requiring a new trial,"[22] some courts have recognized that "[e]ven an unjustified closure may,

---

[21] *See, e.g., United States v. Perry*, 479 F.3d 885, 888–91 (D.C. Cir. 2007) (holding that the closure did not implicate the Sixth Amendment right to a public trial; not reaching the second step in the analysis); *Carson v. Fischer*, 421 F.3d 83 (2d Cir. 2005) (same); *United States v. Ivester*, 316 F.3d 955, 959–60 (9th Cir. 2003) (same); *Braun v. Powell*, 227 F.3d 908, 917–20 (7th Cir. 2000) (same); *Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996) (determining that the unjustified closure did not implicate the Sixth Amendment right to a public trial).

[22] *Braun*, 227 F.3d at 920.

*See also State ex rel. Stevens v. Circuit Court for Manitowoc County*, 141 Wis. 2d 239, 250–51, 414 N.W.2d 832 (1987) (excluding public during testimony of complaining witness in sexual assault case violated Sixth Amendment).

in some circumstances, be so trivial as not to implicate the right to a public trial."[23]

¶ 49. These courts conclude that a closure is trivial and does not implicate the Sixth Amendment if the closure "does not implicate the values served by the Sixth Amendment."[24] The Supreme Court has described four values furthered by the Sixth Amendment guarantee of a public trial: "(1) to ensure a fair trial; (2) to remind the prosecutor and judge of their responsibility

---

[23] *Carson*, 421 F.3d at 92.

*See also Vanness*, 304 Wis. 2d 692, ¶ 9 ("[w]here an unjustified closure is trivial, there is . . . no constitutional violation."); *Perry*, 479 F.3d at 890 (stating that "there are certain instances in which an exclusion cannot be characterized properly as implicating the constitutional guarantee" of a public trial) (quotation marks, brackets, and citation omitted); *Ivester*, 316 F.3d at 960 (stating that a closure may be "too trivial to implicate the Sixth Amendment guarantee" of a public trial); *Braun*, 227 F.3d at 918 ("[O]ur colleagues in the other circuits . . . have recognized that there are certain instances in which the exclusion cannot be characterized properly as implicating the constitutional guarantee [of a public trial]."); *Peterson*, 85 F.3d at 40 ("[E]ven an unjustified closure may, on its facts, be so trivial as not to violate the [Sixth Amendment].")

The State objects to the use of the word "trivial," contending that "if the defendant proves he was denied his fundamental right to a public trial, that is no 'trivial' matter." Brief and Appendix of Plaintiff-Appellant [State] at 25. The cases, however, do not hold that a violation of the Sixth Amendment right to a public trial may be viewed as trivial. The cases instead hold that a *closure* may be viewed as trivial and that, under some circumstances, a closure may be so trivial as not to violate the Sixth Amendment even if the closure is unjustified. We agree with the State that a violation of the Sixth Amendment right to a public trial cannot be characterized as a trivial matter.

[24] *Perry*, 479 F.3d at 890 (quotation marks and citation omitted).

682

to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury."[25]

¶ 50. The State contends that the circuit court's order excluding family members from the courtroom for three days of witness testimony does not implicate the values served by the Sixth Amendment right to a public trial. The State reasons that the trial remained open to all members of the public other than the defendant's family members; that the defendant's mother was permitted to remain in the courtroom gallery; that other family members were present when they took the witness stand to testify for or against the defendant; that the integrity of the witness sequestration order was preserved; that the trial was transcribed for review by the public and by appellate courts; and that a jury of twelve citizens and court personnel attended the trial.[26] According to the State, the presence of the other members of the public sufficed to ensure that the four values served by the Sixth Amendment right to a public trial were protected.

¶ 51. Although the United States Supreme Court has stated that pursuant to the Sixth Amendment right to a public trial, "an accused is at the very least entitledto have his friends, relatives

---

[25] *Peterson*, 85 F.3d at 43 (citing *Waller*, 467 U.S. at 46–47).

These four values do not necessarily represent an exhaustive list of the values served by the Sixth Amendment right to a public trial. *See Peterson*, 85 F.3d at 43 n.5 ("This list is not exhaustive."). *See also* Akhil Reed Amar, *Foreword: Sixth Amendment First Principles*, 84 Geo. L.J. 641, 671–81 (discussing the Sixth Amendment right to a public trial and the purposes served by this constitutional guarantee).

[26] Brief and Appendix of Plaintiff-Appellant [State] at 29–30.

and counsel present,"[27] federal appellate courts have recognized that "the exclusion of a family member or friend may, *in rare circumstances* . . . , not implicate the Sixth Amendment public trial guarantee."[28]

---

[27] *Oliver*, 333 U.S. at 272.

*Accord Perry*, 479 F.3d at 890 ("[T]he Supreme Court has suggested, albeit in dicta, that the right to a public trial entitles a criminal defendant 'at the very least . . . to have his friends, relatives and counsel present . . . .' ") (quoting *Oliver*, 333 U.S. at 272); *Braun*, 227 F.3d at 917 ("Typically, when habeas relief was granted or a new trial required, the courtroom was totally closed to the general public at some critical juncture in the proceedings; or, in other cases, the court excluded a friend or relative of the defendant, in contravention of the Supreme Court's requirement, announced in *In re Oliver*, that such individuals be allowed in the courtroom.") (citation omitted); *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir. 1994) ("[T]he Supreme Court has specifically noted a special concern for assuring the attendance of family members of the accused.").

*See also English v. Artuz*, 164 F.3d 105, 108 (2d Cir. 1998) ("The unwarranted exclusion of a defendant's family members justifies granting habeas corpus relief . . . .").

In *Rodriguez v. Miller*, 537 F.3d 102, 107–110 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit concluded that the *Oliver* Court's expression of particular concern for the accused's right to have relatives present at trial constitutes dicta and that this statement in the *Oliver* opinion therefore does not represent "clearly established federal law" for purposes of deciding a petition for a writ of habeas corpus. *See id.* at 108–110. *See also id.* at 106–07 (" 'Clearly established federal law' refers only to the holdings of the Supreme Court. No principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief."). The *Rodriguez* decision, however, is inapposite to the instant case, which does not involve a petition for a writ of habeas corpus.

[28] *Perry*, 479 F.3d at 890 (*quoting Carson*, 421 F.3d at 94) (emphasis added; ellipsis in *Perry*).

¶ 52. Such "rare circumstances" are not present in the instant case. The circuit court's exclusion of every family member except the defendant's mother (who did not understand English) plainly implicates the values served by the Sixth Amendment right to a public trial. A criminal defendant's family may play a critical role in verifying that the defendant "is fairly dealt with and not unjustly condemned"; in keeping the defendant's "triers keenly alive to a sense of their responsibility and to the importance of their functions"; and in "encourag[ing] witnesses to come forward and discourag[ing] perjury," particularly in a case in which many of the witnesses for either side are themselves members of the defendant's family.[29]

¶ 53. The facts of the instant case contrast sharply with the facts of cases in which courts have concluded that a closure was so trivial as not to implicate the Sixth Amendment right to a public trial. Cases holding that a closure is trivial are typically characterized by the exclusion of an extremely small number of persons from the courtroom[30] or, alternatively, by a

---

[29] *Waller*, 467 U.S. at 46 (quoted source omitted).

[30] *See, e.g., Perry*, 479 F.3d at 890–91 (exclusion of the defendant's eight-year-old son did not implicate the Sixth Amendment right to a public trial where the defendant's "trial remained open to the public—and specifically to [the defendant's] wife—throughout"); *Carson*, 421 F.3d at 94 ("[W]e cannot conclude that the exclusion of Carson's ex-mother-in-law during a single witness's testimony, when four of the defendant's closest family members, as well as others, were present, rendered unconstitutional a closure . . . ."); *Braun*, 227 F.3d at 919 (holding that "exclusion of a sole individual without any significant connection to the case or to the parties . . . does not implicate the policy concerns that inform the Sixth Amendment's right to an open trial").

more general exclusion in effect for an extremely short period of time.[31]

¶ 54. In the instant case, the circuit court excluded the defendant's entire family, with the sole exception of the defendant's mother, for three full days of witness testimony. The closure encompassed several people, and it was not brief or inadvertent. The closure implicated the values of the right to a public trial. The closure implicated the values of (1) ensuring a fair trial; (2) reminding the prosecutor and judge of their responsibility to the accused and the importance of their functions; (3) encouraging witnesses to come forward; and (4) discouraging perjury.

¶ 55. For the reasons set forth, we conclude that the Sixth Amendment right to a public trial is implicated under the circumstances of the instant case.

---

[31] *See, e.g., Ivester*, 316 F.3d at 960 (holding that "the district court's exclusion of the spectators during the brief mid-trial questioning of the jurors to determine if they were concerned for their safety was so trivial as to not implicate Ivester's Sixth Amendment rights"); *Peterson*, 85 F.3d at 41 (holding that the Sixth Amendment right to a public trial was not implicated when "a trial judge inadvertently left a courtroom closed for twenty minutes during which the defendant testified"); *United States v. Al-Smadi*, 15 F.3d 153, 154–55 (10th Cir. 1994) (holding that when court security officers closed the courthouse to the public at 4:30 p.m. and the defendant's trial did not adjourn for the evening until 4:50 p.m., this "brief and inadvertent closing of the courthouse and hence the courtroom, unnoticed by any of the trial participants, did not violate the Sixth Amendment."); *Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir. 1975) (holding that when "a bailiff refused to allow persons to enter or leave the courtroom" for a short time but when "[s]uch condition existed for but a short time and was quickly changed by the Court, when advised of the action of the bailiff," the bailiff's actions were "entirely too trivial to amount to a constitutional deprivation" of the Sixth Amendment right to a public trial.").

Unless properly justified, the circuit court's order excluding family members from the courtroom would constitute a violation of the defendant's right to a public trial under the Sixth Amendment.

## B

¶ 56. Closure of a criminal trial is justified when four conditions are met: "(1) the party who wishes to close the proceedings must show an overriding interest which is likely to be prejudiced by a public trial, (2) the closure must be narrowly tailored to protect that interest, (3) alternatives to closure must be considered by the trial court, and (4) the court must make findings sufficient to support the closure."[32] The case law typically refers to this four-part test as the "*Waller* test," referring to the United States Supreme Court's decision in *Waller v. Georgia*, 467 U.S. 39 (1984).[33]

---

[32] *Vanness*, 304 Wis. 2d 692, ¶ 9 n.3, (citing *Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004)).

[33] The test has its origins in First Amendment jurisprudence. *See Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 509–10 (1984) ("The circumstances under which the press and public can be barred from a criminal trial are limited . . . . The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.") (quoted source omitted). *See also Waller*, 467 U.S. at 44–46 (stating that the analysis in *Press-Enterprise Co.* and several predecessor cases "proceeded largely under the First Amendment").

In comparing the Sixth Amendment right to a public trial with its analogue in First Amendment, the Supreme Court has stated that "the explicit Sixth Amendment right of the accused is

¶ 57. We consider each of the four applicable requirements separately in determining whether the defendant's Sixth Amendment right to a public trial was violated. We conclude that each condition was met under the circumstances of the present case.

(1)

¶ 58. The circuit court justified its order as necessary to ensure that family members attending the trial were not contributing to violations of the court's sequestration order. Although disruptions within the courtroom may be viewed as a justification for a trial court's order excluding family members from the trial, the circuit court in the instant case did not justify its order as necessary to prevent such disruptions or to maintain the dignity, order, and decorum of the courtroom.

¶ 59. The circuit court stated that it issued its order to "protect[] the integrity of [the] proceedings" and that the circuit court could not "allow what [it] believe[d] to be a violation of [its] earlier ruling [imposing the sequestration order] to go unchecked." The circuit court was persuaded that family members in the courtroom gallery were violating the "spirit" of the court's sequestration order by conveying the contents of witness testimony to potential witnesses outside the courtroom.

¶ 60. Sequestration orders serve the important interest of promoting truthfulness in witness testimony. A sequestration order "exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses"; "aids in detecting testimony that is less than candid"; and, when testimony is interrupted by a recess, also may "prevent[] improper attempts to influence [pro-

no less protective of a public trial than the implicit First Amendment right of the press and public." *Waller*, 467 U.S. at 46.

spective] testimony in light of the testimony already given."[34]

¶ 61. The circuit court reasonably concluded that the overriding interest of promoting truthfulness served by its sequestration order was imperiled by the conduct of the defendant's family members. The circuit court's determination that family members were contributing to violations of the sequestration order is supported by the following information that appears in the record: (1) the circuit court witnessed family members entering and leaving the courtroom; (2) members of the victim's family went to the prosecutor with concerns that the persons entering and leaving the courtroom had been conveying information to potential witnesses; and (3) the circuit court witnessed family members in the courtroom gallery talking loudly as witnesses were testifying and even "nodding in approval or disapproval of witnesses' testimony, in full view of the jury."

¶ 62. The defendant contends that the circuit court's findings are insufficient to show that the interests served by the circuit court's sequestration order

---

[34] *Geders v. United States*, 425 U.S. 80, 87 (1976) (citations omitted).

*See also State v. Green*, 2002 WI 68, ¶ 40, 253 Wis. 2d 356, 646 N.W.2d 298 (stating that sequestration orders "are issued to keep witnesses from hearing other witnesses [sic] testimony, which may lead to prejudice to the defendant") (citations omitted); *id.*, ¶ 48 (Abrahamson, C.J., concurring) ("The aim of exclusion and separation orders is to exercise restraint on witnesses tailoring their testimony to that of earlier witnesses; to detect testimony that is less than candid; and, when a witness's testimony is interrupted by a recess, to prevent improper attempts to influence the testimony in light of the testimony already given.") (footnote omitted).

were likely to be prejudiced by allowing the family members to remain. The defendant argues that the circuit court failed to confirm that any persons in the courtroom actually had contributed to a violation of its sequestration order. The defendant concludes that the circuit court's order excluding family members from the courtroom was based on "mere speculation" that the sequestration order had been or would be violated, not on a demonstrated threat to the order.[35]

¶ 63. We agree with Professor LaFave that "[g]enerally, the best course of action is for the trial judge to hold an evidentiary hearing on the issue of closure" when an order of the trial court implicates the Sixth Amendment right to a public trial.[36] We acknowledge that the circuit court could have taken testimony to justify its conclusion that family members in the courtroom were contributing to violations of its sequestration order by conveying the contents of witness testimony to potential witnesses outside the courtroom.

¶ 64. We do not agree, however, with the defendant's characterization of the record. The record shows that the overriding truth-seeking interests served by the circuit court's sequestration order would

---

[35] See English v. Artuz, 164 F.3d 105, 109 (2d Cir. N.Y. 1998) ("[T]he state's obligation to show an overriding interest cannot be met by a proffer of mere speculation.").

See also State ex rel. Newspapers, Inc. v. Circuit Court for Milwaukee County, 124 Wis. 2d 499, 508, 370 N.W.2d 209 (1985) (stating, in a First Amendment case, that "[t]he conclusion that factors weighing in favor of closure are present must be based on articulable facts known to the court rather than unsupported hypotheses or conjecture.").

[36] 6 Wayne R. LaFave et al., Criminal Procedure § 24.1(b), at 304 (3d ed. 2007).

be prejudiced by allowing family members to attend the trial. We therefore conclude that the State has met the *Waller* test's first requirement of an overriding interest likely to be prejudiced by a public trial.[37] Although it

[37] Six federal appellate courts have held that the *Waller* test's first requirement is relaxed when a trial court effectuates only a partial closure of the trial. These courts hold that a party seeking a partial closure is required to show only a "substantial reason" for the closure, rather than an overriding interest that is likely to be prejudiced by a public trial. *See Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir. 1984) (holding that when a partial closure is involved, only a "substantial reason" for the closure is necessary); *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1992) (accepting the Eleventh Circuit's holding in *Douglas*, 739 F.2d 531); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989) ("[T]he Ninth and Eleventh Circuits have applied a less stringent test of a 'substantial reason' where partial closures are held necessary. We are persuaded that we should apply the less stringent 'substantial reason' test . . . .") (internal citations omitted); *Woods v. Kuhnmann*, 977 F.2d 74, 76 (2d Cir. 1992) ("[T]he Ninth, Tenth and Eleventh Circuits . . . have concluded that when a trial judge orders a partial, as opposed to a total, closure of a court proceeding at the request of one party, a 'substantial reason' rather than *Waller*'s 'overriding interest' will justify the closure. . . . We agree."); *United States v. Osborne*, 68 F.3d 94, 98–99 (5th Cir. 1995) ("The Second, Eighth, Ninth, Tenth, and Eleventh Circuits have all found that *Waller*'s stringent standard does not apply to partial closures, and have adopted a less demanding test requiring the party seeking the partial closure to show only a 'substantial reason' for the closure. . . . We agree."); *Garcia v. Bertsch*, 470 F.3d 748, 753 (8th Cir. 2006) ("In cases where a trial judge orders a partial closure at the request of one party, courts have required only a 'substantial reason' for the partial closure, instead of the more stringent 'overriding interest' required by *Waller*.") (citations omitted).

At least one court has rejected the federal appellate courts' rule requiring only a "substantial reason" when a closure is

would have been better practice for the circuit court to make inquiry about the conduct of the defendant's family members and make findings of fact, the circuit court's concerns about the sequestration order were based on the facts the circuit court observed and reasonable inferences from the facts and not on "mere speculation," as the defendant contends.

(2)

¶ 65. The defendant contends that the circuit court's order was overbroad because it applied to the defendant's entire family (except the defendant's mother), even to family members not then present in the courtroom, and not to specific individuals shown to pose a threat to the circuit court's sequestration order.

---

partial. *See People v. Jones*, 750 N.E.2d 524, 529 (N.Y. 2001) ("We are aware that some courts have recognized that a less demanding standard can be applied to limited closure requests . . . . We disagree. We believe that there is no need to adopt such an articulation of the *Waller* standard since *Waller* already contemplates a balancing of competing interests in closure decisions.").

Professor LaFave also apparently is skeptical of the "substantial reason" rule. *See* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.1(b), at 305–06 (3d ed. 2007) (characterizing the rule as an "effort to narrow the class of cases subject to the strict requirements of *Waller*" that is "not surprising given the inability of appellate courts to employ harmless error analysis to avoid retrial in such cases").

We need not, and do not, address whether a partial closure may be supported by a "substantial reason" for the closure instead of an "overriding interest" likely to be prejudiced by a public trial. The State satisfies the *Waller* test's "overriding interest" requirement.

692

¶ 66. We conclude, however, that under the circumstances of the present case the circuit court was justified in applying its order to all family members except for the defendant's mother. The prosecution and defense counsel collectively designated much of the defendant's family—apparently 17 individuals altogether—as potential witnesses at trial. Under these circumstances, it would have been difficult if not impossible for the circuit court to determine which family members were likely to convey the contents of witness testimony to any of the numerous family members slated to testify. Although some family members presumably were more closely related to potential witnesses than others, it is difficult to say where the line between family members could have been drawn. Every person excluded from the courtroom had a significant degree of kinship with the defendant, the victim, and the majority of the potential witnesses in the case.

¶ 67. Moreover, the circuit court lifted its exclusion order once all the witnesses had finished testifying and any threat to the circuit court's sequestration order had been extinguished. Family members were permitted to return to the courtroom to hear the jury instructions and the closing arguments of counsel.

¶ 68. We acknowledge again that the better course of action for the circuit court would have been to determine with more certainty how individual family members may have been contributing to violations of the court's sequestration order and to make more specific findings about the likelihood of violations. Under the circumstances of the present case, however, we cannot say that the circuit court's procedure rendered the circuit court's order broader than necessary to protect the overriding interests served by the circuit court's sequestration order.

¶ 69. The defendant cites three cases in support of his position that the circuit court's order was over-broad: *English v. Artuz*, 164 F.3d 105 (2d Cir. 1998); *State v. Ortiz*, 981 P.2d 1127 (Haw. 1999); and *State v. Clifford*, 733 N.E.2d 621 (Ohio Ct. App. 1999). Each case, however, is distinguishable from the one at bar.

¶ 70. In *English v. Artuz*, 164 F.3d 105 (2d Cir. 1998), English was accused of committing murder at the request of a drug dealer. The circuit court closed the courtroom to all members of the public, including English's family, in the interest of protecting a prosecution witness from the threat of harm.

¶ 71. The United States Court of Appeals for the Second Circuit held that the district court had erred in excluding English's family from the courtroom.[38] The court of appeals stated that the prosecution's witness had testified unequivocally that he did not fear English's family and that the district court easily could have identified the members of English's family.[39] The court of appeals therefore concluded that the closure was not narrowly tailored to protect the prosecution's witness against threat of harm.[40]

¶ 72. *English* is not instructive in the present case. The circuit court in the present case, unlike the district court in *English*, reasonably concluded that the defendant's family members posed a threat to the overriding interests served by the circuit court's seques-tration order. The circuit court determined that members of the defendant's family, not other persons, were acting in a manner contrary to the circuit court's sequestration order forbidding communication between

---

[38] *English*, 164 F.3d at 109.

[39] *Id.*

[40] *Id.*

potential witnesses about the contents of their testimony. In contrast, the district court in *English* drew no connection between the exclusion of English's family members and the goal of protecting the prosecution's witness from the threat of harm posed by others.

¶ 73. The present case is additionally distinguishable from *English* because the district court in *English* could have fulfilled the request to narrow the court's closure order much more easily than the circuit court could have narrowed its order in the instant case. As we have already stated, it would have been difficult if not impossible for the circuit court in the instant case to determine which of the defendant's family members were likely to convey the contents of witness testimony to any of the numerous family members listed as potential witnesses in the trial. The district court in *English*, however, could have reasonably narrowed its closure order by making the simple determination of which persons were related to English and which were not.

¶ 74. In *State v. Ortiz*, 981 P.2d 1127 (Haw. 1999), the prosecutor moved to exclude Ortiz's family from the courtroom on the basis of "an ongoing investigation, involving at least some of Ortiz's family members, into jury tampering, witness tampering, intimidating a witness, and possible retaliation against a witness."[41] The prosecutor made allegations against Ortiz's sister, mother, and brother-in-law but not against any other member of Ortiz's family.[42] The trial court granted the prosecutor's motion over defense counsel's objection. The trial court also kept its exclusionary order in place after it had questioned members of the jury about

---

[41] *State v. Ortiz*, 981 P.2d 1127, 1132 (Haw. 1999).

[42] *Id.* at 1132 n.8.

possible jury tampering and apparently concluded that no tampering had occurred.[43]

¶ 75. The Supreme Court of Hawaii held that the trial court's order was broader than necessary to protect the prosecutor's interest in preventing jury tampering, witness tampering, or the intimidation of or retaliation against witnesses.[44] The Hawaii supreme court first determined that the trial court had erred in excluding Ortiz's entire family when the prosecution had limited its allegations to Ortiz's sister, mother, and brother-in-law.[45] The Hawaii supreme court also concluded that the trial court had further erred in leaving its exclusion order in place even after conducting a voir dire of all the jurors and satisfying itself that no jury tampering had taken place.[46]

¶ 76. The present case is distinguishable from *Ortiz* in each critical respect. The circuit court in the instant case reasonably concluded that the defendant's family members posed a threat to the court's sequestration order given that family members dominated the witness lists. The trial court in *Ortiz* had no basis on which to conclude that members of Ortiz's family other than Ortiz's sister, mother, and brother-in-law were contributing to any risk of jury tampering, witness tampering, or the intimidation of or retaliation against witnesses. In addition, the circuit court in the instant case narrowly tailored the temporal scope of its order by permitting the defendant's family members back in the courtroom once witness testimony had come to an end. The *Ortiz* trial court, in contrast, left its order in place even after questioning the jury and discovering no

---

[43] *Id.* at 1132.

[44] Id. at 1138.

[45] *Id.*

[46] *Id.*

evidence supporting the prosecutor's allegations of jury tampering.

¶ 77. In *State v. Clifford*, 733 N.E.2d 621 (Ohio Ct. App. 1999), the trial court cleared one part of the courtroom of all spectators, apparently due to a disturbance that the record did not explain or describe.[47] The trial court also rejected defense counsel's request to permit Clifford's mother and grandmother to remain in the courtroom.

¶ 78. The Ohio Court of Appeals concluded that the trial court had erred, in part because the trial court's order was broader than necessary.[48] The court of appeals determined that the trial court was unjustified in removing Clifford's mother and grandmother because "there was no evidence concerning their involvement in any disturbance" in the courtroom.[49]

¶ 79. *Clifford* is distinguishable because in that case, the audience members' misconduct and threatened future misconduct all were within the view and control of the trial court. It would have been a simple matter for the trial court to determine who among the audience had been involved in a disturbance and to

---

[47] The record in *Clifford* revealed the following exchange:

[The Prosecutor]: Judge before we go any further, a couple of times there are people in the back and I could —

The Court: All right. All you folks in the back, get out of the courtroom now. Everybody out of the back there. Everybody out of the courtroom and wait outside and don't laugh or I will have you arrested.

[Defense Counsel]: Could the grandfather and mother stay in?

The Court: Everybody on that side, get out. All of you. Get out. Everybody out. Take the children with you please.

*State v. Clifford*, 733 N.E.2d 621, 624 (Ohio Ct. App. 1999).

[48] *Clifford*, 733 N.E.2d at 626.

[49] *Id.*

697

exclude such persons without excluding those audience members who were innocent of misconduct. Furthermore, if any persons not involved in the initial disturbance became involved in future disturbances, the trial court easily could have identified these individuals and added their names to the list of excluded persons.

¶ 80. In the present case, however, the defendant's family members posed a threat to the circuit court's sequestration order that the circuit court could not observe or control. It would have been difficult if not impossible for the circuit court to determine which family members were likely to convey the contents of witness testimony to any of the numerous other family members listed as potential witnesses. The present case thus is unlike *Clifford*, in which the trial court easily could have distinguished between individual members of Clifford's family in excluding disruptive persons from Clifford's trial.

(3)

¶ 81. The defendant asserts that the circuit court failed to consider any reasonable alternatives to its order excluding the defendant's family members from the courtroom. The defendant suggests that the circuit court should have considered the alternatives of "limit[ing] its exclusionary rule to those members of the public married to or living with anticipated witnesses" or of making inquiries "prior to the testimony of the various family members to determine whether they had received any information concerning courtroom proceedings in violation of the [sequestration] order."[50]

---

[50] Brief of Defendant-Respondent-Petitioner at 14.

¶ 82. These alternatives were not suggested to the circuit court. The cases reasonably hold that "a trial judge need not consider alternatives to a limited closure sua sponte."[51] Although we agree with the New York Court of Appeals that "it is surely the better practice for trial courts to explore the feasibility of possible alternatives to closing the courtroom with counsel on the record, even where it is not mandated,"[52] we cannot conclude under the circumstances of the present case that the alternatives suggested by the defendant are reasonable or that the circuit court erred in failing to consider alternatives that no party asked it to consider.

¶ 83. Under the circumstances of the present case, where the circuit court's order was not overbroad and where the circuit court attempted to get compliance with the sequestration order, we conclude that in ordering the defendant's family members to remain outside the courtroom during the witnesses' testimony, the circuit court implicitly determined that no less restrictive alternative would protect its interest in ensuring the sanctity of its sequestration order.[53] Accordingly, we

[51] *Carson*, 421 F.3d at 90.

*See also People v. Ramos*, 685 N.E.2d 492, 500 (N.Y. 1997) ("[W]here the factual record permits closure and the closure is not facially overbroad, the party opposed to closing the proceeding must alert the court to any alternative procedures that allegedly would equally preserve the interest.") (citation omitted).

[52] *Ramos*, 685 N.E.2d at 501 (quotation marks and citation omitted).

[53] *Compare Ramos*, 685 N.E.2d at 500 ("We conclude that, under the circumstances now presented, it can be implied that the trial court, in ordering closure, determined that no lesser alternative would protect the articulated interest.") (citation omitted).

■■■

■■■

conclude that the circuit court satisfied the requirement of considering reasonable alternatives to its closure order.

(4)

■■

¶ 84. The defendant correctly notes that the fourth requirement of the *Waller* test is closely interrelated with the other three requirements.[54] The gist of the fourth requirement is that the trial court's compliance with the first three requirements must be apparent from the trial court's findings in the record. In other words, the purpose of the fourth requirement "is simply to allow a reviewing court to determine whether the closure order was properly entered."[55]

¶ 85. We have stated that the circuit court could have done a better job in the instant case of explaining and justifying its order on the record. When the State or the circuit court seeks a nontrivial closure of the courtroom implicating the defendant's Sixth Amendment right to a public trial, the circuit court should ensure that it makes findings of fact on the record, that it applies the *Waller* test, and that the record demonstrates due regard for the defendant's Sixth Amendment right to a public trial. Both the prosecutor and defense counsel should bring the Sixth Amendment right to a public trial to the circuit court's attention and

---

[54] *See* Brief of Defendant-Respondent-Petitioner at 10 ("Because the first *Waller* factor, requiring the court to identify an interest that would be jeopardized without a closure order, and the fourth, requiring findings of fact supporting the closure, are interrelated, they will be dealt with jointly in this section.").

[55] *Carson*, 421 F.3d at 90 (quotation marks, brackets, and citation omitted).

should assist the circuit court in crafting a closure order consistent with the Sixth Amendment's "basic tenet of our judicial system."[56]

¶ 86. Although we acknowledge that the circuit court's findings on the record are limited and no hearing was held, we nevertheless conclude that the record is sufficient to support the closure order. The closure was narrowly tailored to serve an overriding interest likely to be prejudiced unless the family members were excluded.

¶ 87. For the reasons set forth, we conclude that the circuit court did not violate the defendant's Sixth Amendment right to a public trial.

## IV

¶ 88. The defendant asserted in his postconviction motion that he is entitled to a new trial on several bases unrelated to the Sixth Amendment right to a public trial. The defendant asserted that the circuit court had erred in admitting certain witness testimony; that his counsel was ineffective for failing to move for a mistrial and for failing to object to certain portions of the State's closing arguments; and that a new trial should be granted on the basis of newly discovered evidence.

¶ 89. At the hearing on the defendant's postconviction motion, the circuit court did not reach these other issues raised in the defendant's motion. We also do not address these issues but instead remand the cause to the circuit court for any additional postconviction proceedings required by law.

---

[56] *Vanness*, 304 Wis. 2d 692, ¶ 8.

¶ 90. Our decision, however, precludes the defendant from arguing on remand, as he did in his briefs to this court, that his trial counsel was ineffective for failing to object to the exclusion of family members from his trial. The defendant's argument essentially is that his counsel was ineffective for failing to secure a public trial for the defendant. This argument is inconsistent with our holding that, regardless of defense counsel's performance at trial, the defendant received a public trial consistent with the guarantee in the Sixth Amendment of a public trial.

* * * *

¶ 91. Because both parties failed to bring arguments to the circuit court in a timely manner and have briefed the substantive issue whether the circuit court's order excluding family members violated the defendant's Sixth Amendment right to a public trial, this court has decided to reach the merits of the issue presented, rather than to assess comparative blame and address the effect of the defendant's failure at trial to raise the Sixth Amendment issue and the State's failure at the postconviction hearing to raise the defendant's waiver/forfeiture at trial of the Sixth Amendment issue. We conclude that the exclusion of family members from three days of the trial implicated the defendant's Sixth Amendment right to a public trial but did not, under the circumstances of the instant case, violate the defendant's Sixth Amendment constitutional right.

¶ 92. We do not address whether the defendant is entitled to a new trial on any basis unrelated to the Sixth Amendment right to a public trial. We agree with the court of appeals that the matter is to be remanded to the circuit court for any additional postconviction proceedings required by law.

¶ 93. Accordingly, we affirm the court of appeals decision, although on different grounds, reversing the postconviction order granting the defendant a new trial, reinstating the judgment rendered by the jury, and remanding the matter to the circuit court for any additional postconviction remedies required by law. We remand the matter, as did the court of appeals, to the circuit court for additional postconviction proceedings required by law.

¶ 94. *By the Court.*—The decision of the Court of Appeals is affirmed and the cause remanded to the circuit court.

¶ 95. DAVID T. PROSSER, J. *(concurring)*. The majority opinion is scholarly, but it fails to recite a number of key facts that provide context and perspective to the constitutional issues before the court. This concurrence will set out those additional facts and then explain why the defendant forfeited the right to assert a violation of his public trial right long after his conviction and sentence.

I

¶ 96. On Saturday, November 23, 2002, approximately 50 persons of Albanian descent gathered at the Albanian Community Center in South Milwaukee to celebrate the birthday of a young child. Most, if not all, of the persons in attendance were related to each other by blood or marriage. The child's birthday presented the opportunity for a family party. The party was held several days before the annual celebration of Albania's independence (November 28) and shortly before the defendant, Dhosi Ndina—one of the five sons of Stefani Ndina (the family matriarch)—was scheduled to fly

back to Albania. The party was festive, with music, dancing, and ample food and drink, including alcoholic beverages.[1]

¶ 97. Sometime after midnight, a dispute broke out among the children of Ilia Ndina and Robert Janko. This skirmish prompted an argument between the two fathers.

¶ 98. Erjon Dhembi, then 22, knew the two men well. One, Ilia Ndina, was his uncle. Ilia was the brother of Erjon's mother, Konstandina. She, in turn, was a daughter of Stefani Ndina. The other father, Robert Janko, was Erjon's cousin. As the argument proceeded, Erjon got up from the table where he had been seated for dinner and urged the two men to calm down and respect the atmosphere of the family gathering. With peace apparently restored, the three men returned to their seats.

¶ 99. Ilia Ndina was seated at a table on one side of the community center near his brother Dhosi, who was visiting from Albania. Moments later, the two men approached Erjon Dhembi from behind. Ilia Ndina "tapped" Erjon on the right shoulder and threatened to kill him. Immediately thereafter, Dhosi Ndina stabbed

---

[1] Albanian family bonds are especially strong. It is not uncommon for generations of a family to work together in a family-run business. Many extended families live together and care for each other. Often adult children live with their parents, or several generations live under the same roof. . . .

*Family events, such as engagement parties and weddings, are important social events in the Albanian community. . . .*

Preparing and sharing food are central to Albanian family life.

Megan Brody, Albania and Albanians in the United States (2003), http://www2.bc.edu/~brisk/albania.htm (last visited Feb. 23, 2009) (emphasis added).

Erjon in the neck with a steak knife and then stabbed him again in the back. Bleeding heavily, Erjon stood up and began walking to seek medical attention, but he quickly stumbled and then fell. He was assisted by his father, Spiro Dhembi, two uncles, Ardian and Llazi Ndina, and his sister Eglantina Dhembi. His family rushed Erjon to St. Luke's South Shore Hospital in Cudahy. He was then transported by helicopter to Froedtert Memorial Lutheran Hospital where he underwent emergency surgery.[2]

¶ 100. Erjon's father, Spiro, was incensed by the attack on his son. He and Eglantina went to the South Milwaukee Police Department to report the incident before they learned that Erjon's condition required that he be transferred to another hospital.

¶ 101. Acting on the information the Dhembis had supplied to the South Milwaukee police, the Milwaukee County District Attorney's office issued a criminal complaint against Dhosi Ndina and obtained a warrant for his arrest. The complaint was filed and the warrant obtained on Sunday, the 24th of November. Authorities acted quickly in an effort to arrest Dhosi before he could catch a scheduled flight to Albania.

¶ 102. Although he spoke little or no English, Dhosi was somehow able to elude capture and fly home. He was apprehended in Albania months later, on August 13, 2003, and remained in custody there until he was extradited to the United States on April 21, 2004.

---

[2] The victim's sister, Eglantina, testified that after the stabbing she "actually" put her finger in the back of Erjon's neck trying to stop the bleeding. The victim himself testified: "I lost a quarter of my lungs . . . and part of my rib." In all, Erjon Dhembi suffered a severed artery and a collapsed lung and was hospitalized for a week.

¶ 103. When Dhosi was returned to Milwaukee, his family hired a prominent criminal lawyer, James E. Kachelski, to represent him on a charge of attempted intentional homicide. Sixteen members of the family attended the preliminary hearing. When Kachelski later persuaded the court to reduce Dhosi's bond from $100,000 to $50,000, Dhosi's family pooled their resources to put up the cash. Dhosi was then placed on in-house monitoring and required to live with his mother who is also the victim's grandmother. Other members of the Ndina family lived in the same duplex.

¶ 104. The fact that the defendant was confined to the home of the victim's grandmother undermined the court's release condition that the defendant have no contact with the victim's family. In effect, the victim's family and the defendant's family so overlapped that they were not readily distinguishable.

¶ 105. On April 29, 2005, Attorney Kachelski filed the defendant's witness list for trial. It contained the names of 13 family members. The State's witness list included four additional family members.

¶ 106. On May 5, Kachelski filed motions on sequestration of witnesses and introduction of witnesses. The sequestration motion asked that "all witnesses for the prosecution or the defense be excluded from the courtroom, including during voir dire, and that all witnesses be admonished not to discuss their proposed testimony or completed testimony with any other witness during the pendency of this trial." Another motion requested that "no distinction be drawn during voir dire between possible prosecution and defense witnesses, and that the court introduce all witnesses as possible witnesses, and not as prosecution or defense witnesses." The court ultimately entered a sequestration order that

effectively barred 17 family members, including the victim, from the courtroom except when they were testifying.

¶ 107. In his opening statement, Attorney Kachelski told the jury that "there's going to be quite a few witnesses, and these witnesses have different vantage points, *different biases, different family alliances* . . . . I think it would be unnatural if family members didn't talk about this incident. And memories can start to fade over time . . . ." (Emphasis added.) Attorney Kachelski continued, "[T]hings will become important when you analyze what the witnesses say, analyze their vantage point, *their motives,* consider what they're saying, *their biases, their family allegiances.*" (Emphasis added.)

¶ 108. Kachelski's statements, whatever their intent, revealed the divisions and conflicting loyalties that had developed in the family as a result of Erjon's stabbing and Dhosi's prosecution. These divisions were frequently confirmed in subsequent testimony.

¶ 109. Dhosi's trial began on May 9, 2005, with voir dire and the selection of a jury. On May 11, during testimony of the State's third witness, Spiro Dhembi, the court briefly stopped the proceeding. The transcript reads as follows:

Q So let me be clear. You're saying that Ilia got up, walked over and punched Erjon?

A Yes.

Q And then it was minutes later that Dhosi came up and stabbed him?

A Yes.

Q And —

THE COURT: One moment. One moment.

BY MR. ZIER:

707

Q How was it you were able to see —

THE COURT: One moment. Tim?

THE BAILIFF: I hope they speak English.

THE COURT: Ms. Hysi, I'm going to have you go out with my deputy.

(Discussion off the record.)

THE COURT: You may continue.

¶ 110. After the jury was released for the evening, the court made the following record of what had transpired:

> I was also, from my point of observation up here on the bench which is higher than all of the other places in the courtroom, able to see individual family members in the gallery who were also engaging in a level of conversation that not only the Court could hear, but I feared that the jury could hear as well.

> We stopped the proceedings or I stopped the proceedings and directed my deputy along with interpreter Vera Hysi to communicate to those members in the gallery — those family members in the gallery that they must remain silent and not talk among each other while they are in the courtroom.

> I observed my deputy and Miss Hysi go into the gallery and communicate that order and directive from the Court. Thereafter it appears that the — my order has been followed. I have not seen or heard anything from those family members in the gallery since that directive was made.

> In addition, however, the Court noted that as Mr. Spiro Dhembi was becoming more emotional, agitated on the witness stand, the Court also observed the defendant begin to respond. Both of them were speaking in their native tongue, Albanian. The Court did not

708

know what they were saying although they were speaking, and it was clear to the Court that it wasn't in response to any particular question that had been put to the witness.

I directed both the witness, Mr. Dhembi, and the defendant, Mr. Ndina[,] that they are not to talk or converse unless a question has been put to them directly.

¶ 111. The facts above were known to the court and to counsel before the incident the following day in which the court excluded family members (except Stefani Ndina) from the courtroom. *See* majority op., ¶¶ 13–14. These facts presented extraordinary circumstances to the circuit court—circumstances that cannot be separated from the legal issues now under review.

## II

¶ 112. Dhosi Ndina's trial lasted 10 days. The jury returned its verdict at 10:15 a.m. on May 20, the tenth day.

¶ 113. The majority opinion describes, in ¶¶ 14–17, the events near the end of the fourth day of trial when the court issued its order excluding all family members from the courtroom.

¶ 114. "As an exception to its order, the circuit court permitted the defendant's mother to remain in the courtroom." Majority op., ¶ 16. The defendant attacks the significance of this exception, contending that his mother did not speak English at the time of the trial. This may be true, but the record reveals that Stefani Ndina was a naturalized U.S. citizen whose father had been a U.S. citizen.

¶ 115. In any event, the courtroom was closed to other members of the family on Friday, May 13; Monday, May 16; and Tuesday, May 17. Excluded persons missed

part of the lengthy testimony of Spiro Dhembi; the testimony of State witnesses Francis Rotter, David Hoeppner, Brian Fleming, and Peter Jaske, all South Milwaukee police officers; the testimony of defense witnesses Ardian Ndina, Bledian Ndina, Mimoza Ikonomi, Vasilika Proko, Kastriot Fekollari, and Egriselda Fekollari; and the testimony of rebuttal witnesses Spiro Dhembi, Eglantina Dhembi, and Francis Rotter. Family members returned to the courtroom on May 18 through May 20 for jury instructions, closing arguments, jury deliberations, and the verdict.

¶ 116. In sum, a few persons not otherwise excluded because of their status as listed potential witnesses missed three days of the trial because of the court's order. They missed the testimony of four police officers, none of whom witnessed the crime; six defense witnesses; some testimony from Spiro Dhembi; and rebuttal testimony from Spiro and Eglantina Dhembi, most of whose testimony had been fully open, and Francis Rotter.

¶ 117. Attorney Richard Kaiser, who skillfully represented Dhosi Ndina in post-sentencing proceedings, produced sworn affidavits from Vladimir Ndina, Lola Ndina, and Femi Ikonomi, indicating that they would have attended the trial, or more of the trial, had they not been excluded by the court's order. In his own affidavit, Attorney Kaiser added that three other persons, Bule Spathiu, Mosko Proko, and Maksut Spathiu, had wanted to attend the trial and that Enkeleda Ndina had been removed from the courtroom.

¶ 118. These seven persons require analysis. First, the defendant filed three affidavits, not seven.[3]

---

[3] The fact is that Attorney Kaiser prepared eight affidavits to support his motion, but only three of them were filed.

Second, all seven persons may have been present at the Albanian Community Center on November 23–24, 2002, and if they were, they could have been listed as witnesses or called as rebuttal witnesses. Third, Vladimir Ndina, the defendant's brother, was indisputably present at the Albanian Community Center. Lola Ndina is married to one of Dhosi's brothers (not Ilia) and was very likely at the Albanian Community Center, as Ardian, Llazi, and Vladimir Ndina, the remaining brothers, were all present. Femi Ikonomi is the father-in-law of Mimoza Ikonomi, the defendant's sister and a defense witness. Mosko Proko is the father-in-law of Vasilika Proko, another of the defendant's sisters and a defense witness. Like Lola Ndina, Enkeleda Ndina was married to one of the defendant's brothers (not Ilia, who was married to Flora). Maksut and Bule Spathiu are apparently related to the defendant by marriage. Even under the most ideal circumstances, the court would have been hard pressed to draw meaningful distinctions among these people, a number of whom were not present when the ruling was made.

¶ 119. In addition, the court did not prohibit friends of the defendant who were not family members from attending the trial. Moreover, the court never closed the courtroom to news media or the public at large,[4] and it acted explicitly to protect a sequestration order requested by the defendant.

¶ 120. Thus, it is beyond belief to suppose that the circuit court's decision on May 12, 2005, to temporarily exclude family members from the courtroom, amounted to the kind of "structural error" in the judicial process

---

[4] The court noted the presence of a school group in the courtroom early in the trial.

that would warrant a new trial, especially in the absence of even a murmur of protest from the defendant or the defendant's counsel.

### III

¶ 121. Although I agree with the majority's affirmation of the court of appeals' decision, I am troubled by the majority's unwillingness to make a forfeiture determination one way or the other, thereby necessitating an elaborate, not always persuasive analysis of whether the circuit court's order excluding family members from three days of trial violated the defendant's Sixth Amendment right to a public trial. In my view, the defendant forfeited the right to assert a violation of his public trial right when he failed to make a timely objection—an objection that would have permitted the court to modify its order if needed and address any legitimate concerns.

¶ 122. As a general rule, a constitutional error does not automatically require reversal of a conviction. *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991) (opinion of Chief Justice Rehnquist) (citing *Chapman v. California*, 386 U.S. 18 (1967)). However, "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman*, 386 U.S. at 23, n.8 (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963) (right to counsel); *Payne v. Arkansas*, 356 U.S. 560 (1958) (coerced confessions); and *Tumey v. Ohio*, 273 U.S. 510 (1927) (right to an impartial judge)).

¶ 123. In *Fulminante*, the Supreme Court explained that the "common thread" connecting cases in which a harmless error analysis may be applied is that "each involved a 'trial error'—error which occurred

712

during the prosecution of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307–08. The Court thereupon changed the rule on admission of an involuntary confession—"a classic 'trial error' "—because it deemed admission of this evidence as "markedly different from the other two constitutional violations" referred to in *Chapman*, e.g., *total* deprivation of the right to counsel and trial before "a judge who was not impartial." *Id.* at 309. "These," the court stated, "are *structural defects* in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* (emphasis added). "The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial." *Id.* at 309–10.

¶ 124. The Court then noted that "other cases [since *Chapman*] have added to the category of constitutional errors which are not subject to harmless error." *Id.* at 310 (citing *Vasquez v. Hillery*, 474 U.S. 254 (1986) (the unlawful exclusion of members of the defendant's race from a grand jury); *Waller v. Georgia*, 467 U.S. 39 (1984) (the "right to public trial"); and *McKaskle v. Wiggins*, 465 U.S. 168 (1984) (the right to self-representation at trial)). "Each of these constitutional deprivations is a similar *structural defect* affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* (emphasis added).[5]

---

[5] Other cases can be added to the list of constitutional errors not subject to harmless error analysis: *United States v.*

¶ 125. In *Neder v. United States*, 527 U.S. 1 (1999), the Court observed that "we have found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.' " *Id.* at 8 (quoting *Johnson v. United States*, 520 U.S. 461, 468–69 (1997)).

¶ 126. The Court has said that structural errors "infect the entire trial process," *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993), and "necessarily render a trial fundamentally unfair," *Rose v. Clark*, 478 U.S. 570, 577 (1986). These errors deprive defendants of basic protections without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Id.* at 577–78.

¶ 127. The Court also has said, however, that the determination of a structural error may rest "upon the difficulty of assessing the effect of the error." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006). Writing for a majority of the Court, Justice Scalia said that fundamental fairness is not the sole criterion of structural error. *Id.* He pointed to *Waller* as an example of a case in which "difficulty of assessment" heavily influenced the "structural error" categorization by the Court. *Id.*

¶ 128. The *Gonzalez-Lopez* decision appears to signal a shift in the Court's rationale for structural error, from an error that is so clear and fundamental

*Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (erroneous denial of the right to counsel of choice); *Sullivan v. Louisiana*, 508 U.S. 275, 277–82 (1993) (deficient reasonable doubt instruction); *Gomez v. United States*, 490 U.S. 858, 876 (1989) (voir dire and jury selection before a magistrate who lacks jurisdiction); and *Price v. Georgia*, 398 U.S. 323, 331 (1970) (second prosecution for the same offense after conviction of lesser-included offense is reversed).

that evaluation is unnecessary to an error for which evaluation is speculative or impossible.

¶ 129. In any event, the inclusion of *Waller* in the list of cases exposing "structural error" is problematic. It is true that "the benefits of the public trial are frequently intangible, difficult to prove, or a matter of chance." *Waller*, 467 U.S. at 49 n.9. Hence, violation of the right satisfies some of the rationale for setting aside the harmless error standard.

¶ 130. However, *Waller* itself stated that "the Court has made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Id.* at 45. In other words, there are certain cases in which a court is able to justify closing a trial to the public. *Cf. Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004) ("[W]hile criminal trials that are not open to the public are strongly disfavored, they are not forbidden.").

¶ 131. The indefinite nature of the public trial right is further complicated by the broad array of situations in which a criminal trial may be temporarily closed, or closed to some people but not all people.

¶ 132. The difficulty in assessing whether a defendant's public trial right has been violated counters the difficulty in assessing the *effect* of a violation upon the defendant. This is surely one reason why *Waller* indicated that violation of the right to a public trial is not subject to "automatic reversal" in the same way as violation of certain other rights. Waller's case was remanded to the trial court for a suppression hearing after the Court determined that a violation had occurred. *Waller*, 467 U.S. at 49–50.

¶ 133. The *Waller* Court agreed with the proposition that "the defendant should not be required to prove specific prejudice in order to obtain *relief* for a violation of the public-trial guarantee." *Id.* However, it asserted that the *relief* "should be appropriate to the violation." *Id.* at 50. The Court did not refer to "structural error" in the opinion, because that term did not come along until later. Although it quoted from a dissenting opinion of Justice William Brennan, *Levine v. United States*, 362 U.S. 610, 627 n.* (1960) (Brennan, J., dissenting) ("[T]he settled rule of the federal courts [is] that a showing of prejudice is not necessary for reversal of a conviction not had in public proceedings."), the unanimous *Waller* Court did not adopt a rule of "automatic reversal" of conviction for every violation of the public trial right.

¶ 134. To sum up, *Waller* does not fit well into the structural error category if "structural defects always lead to automatic reversal." *Gonzalez-Lopez*, 548 U.S. at 159 (Alito, J., dissenting) (citing *Fulminante*, 499 U.S. at 306–10); *cf. Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("Some [constitutional errors] will always invalidate the conviction.").

¶ 135. Categorizing the violation of the Sixth Amendment right to a public trial as structural error does not relieve a defendant of the obligation to enter a timely objection to a violation of the right *unless the defendant is not in a position to do so.*

¶ 136. Normally, a defendant asserting violation of a constitutional right must object at the time of the violation or forfeit the right to raise the issue later. In *United States v. Olano*, 507 U.S. 725 (1993), the Court declared that " 'No procedural principle is more familiar to this Court than that a constitutional right . . . may be forfeited in criminal as well as civil cases by the failure

to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " *Id.* at 731 (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)).

¶ 137. The court of appeals relied upon this principle to avoid a full-blown analysis of Dhosi Ndina's constitutional right to a public trial, and it turned instead to the question of whether the defendant had been denied effective assistance of counsel. Our challenge is to determine whether the court of appeals made the correct call.

¶ 138. It must be noted that defendant Waller objected to closing the suppression hearing that was held prior to his trial. *Waller,* 467 U.S. at 40. This objection unquestionably helped his case. The Court said: "[W]e hold that under the Sixth Amendment any closure of a suppression hearing [to the public] *over the objections of the accused* must meet the tests set out in *Press-Enterprise [Co. v. Superior Court of California,* 464 U.S. 501, 510 (1984),] and its predecessors." *Id.* at 47 (emphasis added).[6] The Court also distinguished Waller's position from that of another defendant, Cole, stating:

> Counsel for petitioners Waller, Thompson, Eula Burke, and W.B. Burke lodged an objection to closing the hearing. *Counsel for petitioner Cole concurred in the prosecutor's motion to close the suppression hearing.*

---

[6] The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
*Press-Enter. Co. v. Superior Court of California,* 464 U.S. 501, 510 (1984).

> Respondent argues that Cole is [now] precluded from challenging the closure . . . . Cole's claims in this Court are identical to those of the others. Since the cases must be remanded, we remand Cole's case as well. *The state courts may determine on remand whether Cole is procedurally barred from seeking relief as a matter of state law.*

*Id.* at 42 n.2 (citations omitted) (emphasis added).

¶ 139. The "matter of state law" to which the Court referred is the state law on forfeiture.

¶ 140. No doubt there are situations in which the forfeiture rule does not apply because the defendant is not in a position to make a timely objection. For instance, in *Walton,* the prosecution's entire case against Walton was held in the late evening hours after the courthouse had been closed and locked for the night. *Walton,* 361 F.3d at 432. Walton did not object, but he may not have realized at the time that the courthouse had been locked. *Id.* Likewise, in *State v. Vanness,* 2007 WI App 195, 304 Wis. 2d 692, 738 N.W.2d 154, the defendant did not object to closing the courthouse during his trial because the doors were locked before he realized what had happened. *Id.,* ¶¶ 2–3. Vanness did promptly move for a mistrial when he learned what had happened. *Id.,* ¶ 3.

¶ 141. The line of cases in which a defendant is not in a position to make an objection to a closed or partially closed trial does not apply here. To my mind, it would be difficult to concoct a clearer example of forfeiture than this defendant's failure to register a timely objection to the court's order. The defendant was fully aware of the circumstances: he was forewarned of the court's concerns on May 11; he observed first-hand the court's decision to exclude family members on May 12; and he was present when the court revisited the

718

issue on May 13. The only plausible explanation for the defendant's silence is the manifest reasonableness of the court's order under the circumstances.

¶ 142. In most of the Supreme Court cases identifying or discussing structural error, the defendant, like Waller, timely asserted his rights or timely lodged an objection. *See Gonzalez-Lopez*, 548 U.S. at 140; *Neder*, 527 U.S. at 6; *Brecht*, 507 U.S. at 625; *Fulminante*, 499 U.S. at 283; *Vasquez*, 474 U.S. at 256; *McKaskle*, 465 U.S. at 168; *Gideon*, 372 U.S. at 337; *Payne*, 356 U.S. at 561. In some cases, the presence or absence of a timely objection was not discussed. *See Sullivan*, 508 U.S. at 275; *Rose*, 478 U.S. at 570. The Supreme Court has not become indifferent to the importance of making timely objections.

## IV

¶ 143. This case presents the challenge of reconciling the protection of an important Sixth Amendment right with the necessity of requiring the key players in a criminal proceeding to conduct themselves in a manner that promotes and preserves the orderly administration of justice. Timely objections are vital to the orderly administration of justice. A party's failure to make a timely objection ought to entail a cost to the party unless the failure is justified by the circumstances, or the judiciary is *required* to vindicate a higher value. If a deficient party is rewarded for its lack of diligence, it will not be diligent.

¶ 144. This defendant was required to object to the exclusion of family members from the courtroom at the time they were excluded inasmuch as he (and his experienced counsel) knew exactly what was happening and why. He was not entitled to remain silent in the

face of the court's order and then raise a constitutional objection many months after he was convicted and sentenced.

¶ 145. A defendant who fails to object still may argue that his counsel provided ineffective assistance. A defendant also may invoke the plain error doctrine that was discussed last term in *State v. Jorgensen*, 2008 WI 60, ¶ 23, 310 Wis. 2d 138, 754 N.W.2d 77 ("If the defendant shows that his unobjected to error is fundamental, obvious, and substantial, the burden then shifts to the State to show the error was harmless."). *Cf. Johnson*, 520 U.S. at 461; *Olano*, 507 U.S. at 725; *State v. Mayo*, 2007 WI 78, 301 Wis. 2d 642, 734 N.W.2d 115. Both options put the initial burden on the defendant so that he is not rewarded for failing to make a timely objection.

¶ 146. For the reasons stated, I respectfully concur.

¶ 147. I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER and Justice MICHAEL J. GABLEMAN join this concurrence.