COURT OF APPEALS
DECISION
DATED AND FILED

February 22, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP1750-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2013CF5083

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

RONALD HENRY GRIFFIN,

DEFENDANT-APPELLANT.

APPEAL from a judgment and orders of the circuit court for Milwaukee County: STEPHANIE ROTHSTEIN, Judge. *Affirmed*.

Before Donald, P.J., Dugan and White, JJ.

¶1    WHITE, J.  Ronald Henry Griffin, *pro se*, appeals his judgment of conviction entered upon a jury verdict for first-degree sexual assault, forcibly aiding and abetting; second-degree sexual assault; and attempted second-degree sexual assault.  He also appeals the circuit court orders denying his postconviction

motion and his motion for reconsideration, both without a hearing. Griffin argues that the State failed to turn over ***Brady***[1] material, trial counsel was ineffective, and the trial court erred when it admitted certain evidence. We reject his arguments, and accordingly, we affirm.

## BACKGROUND

¶2 This case arises out of an allegation that Griffin and a co-actor, Ricky Taylor, sexually assaulted T.F., a woman who visited Taylor's apartment in South Milwaukee on October 30, 2013. According to the criminal complaint, Taylor invited T.F. to visit him and when she arrived, Griffin was in the apartment as well. Taylor forced T.F. to perform fellatio on him and then Griffin removed T.F.'s pants and assaulted her through anal intercourse. After T.F. struggled, Taylor left and Griffin attempted to have vaginal intercourse with T.F. When he did not succeed, he again assaulted her anally. T.F. punched Griffin in the head and eventually pushed him into a wall. T.F. jumped up, grabbed her clothes and fled the apartment.

¶3 Several days later, T.F. complained to the South Milwaukee Police Department about the assaults. Griffin and Taylor were arrested at Taylor's apartment building. They were each charged with counts of first-degree and second-degree sexual assault and Griffin was charged with attempted second-degree sexual assault.

¶4 In May 2014, Taylor entered a plea to resolve his charges. Taylor pled guilty to third-degree sexual assault (amended from the count for second-

[1] ***Brady v. Maryland***, 373 U.S. 83, 87 (1963).

degree sexual assault), and his charge for first-degree sexual assault, forcibly aiding and abetting, was dismissed outright. In exchange, Taylor agreed to serve as a witness against Griffin.

¶5 The case against Griffin proceeded to trial in December 2014. T.F. testified about meeting Taylor and conversing with him by telephone and text over a two month span of time. When T.F. was in Taylor's neighborhood on October 30, 2013, Taylor invited her to stop by his apartment. She took her boots off when she got inside the apartment because it "had been snowing and [she] didn't want to track that through the house." Taylor asked T.F. if she wanted to see a photo in a bedroom. She agreed, and while T.F. looked at the photo, Taylor took off all of his clothing except his boxer shorts. She told Taylor, "No. That's not all happening tonight." He shut the bedroom door and then Taylor forced T.F.'s head down and forced her to give penis-to-mouth intercourse. She said he forced his penis into her mouth and into her throat "with force" and she "couldn't speak."

¶6 T.F. further testified that Taylor then told Griffin to come inside and told T.F. that Griffin was going to "hit me from the back," which she interpreted to mean he would have anal intercourse with her. T.F. fought against Taylor's hold. Griffin then came in and pulled off T.F.'s pants and underwear and "inserted his penis into my butt." T.F. "freak[ed] out" and Griffin fell against the bed; T.F. started kicking Taylor and he got "really angry" and "got up, turned off the lights, closed the door, and left" T.F. alone in the room with Griffin. Griffin then tried, but failed, to insert his penis into T.F.'s vagina. T.F. got a hand free and began to punch Griffin in the head. Griffin got very angry, "grabbed my arms and put them down very hard. And then he shot his penis very hard into my butt, very hard, and it hurt and I was trying to get away and it took my breath away." T.F. then

3

stopped fighting Griffin, jumped off the bed, grabbed her pants and then went to the dining room to put on her boots. T.F. left the apartment crying. She testified that the visit and assaults all occurred within forty minutes.

¶7 T.F. testified that she met with her counselor and decided to report the October 30, 2013 assault. On the morning of November 3, 2013—four days after the assault—T.F. planned to report the assault to the police; however, before she went to the police station, Taylor called T.F. and asked her to take him to the grocery store. T.F. said she would call him later and then went to the police station. T.F. met with Officer David Kozlowski, who interviewed T.F. and then arranged for T.F. to make a one-party consent recorded call to Taylor to see if he would say what he did. The State then played the recording of the phone call for the jury, and T.F. identified her and Taylor's voices in the recording.

¶8 T.F. testified that she told Officer Kozlowski that prior to going to the police, she found a photo of Griffin on a "social media site."[2] T.F. further described identifying both Taylor and Griffin in photo arrays with a police officer.

¶9 T.F. testified that after meeting with police, she went to the Aurora Sinai Medical Center Sexual Assault Treatment Center for an examination. T.F. reported that she had bruises on her hands, arms and legs; and both her throat and her anus were very sore.

¶10 Prior to the State calling Taylor as a witness, trial counsel objected to the admission of two letters purportedly from Griffin to Taylor. The court

---

[2] The record is clear that the jury was not informed about which site T.F. used; however, relevant to this appeal, the site was the Wisconsin Department of Corrections Sex Offender Registry.

considered the objection untimely because the letters had been disclosed before trial and Griffin had not objected.

¶11     Taylor testified that T.F. came over to his apartment at his invitation and he thought it was a "consensual situation" when T.F. came into the bedroom to look at a photo, and Taylor then turned the lights off and laid down on the bed. Taylor then using one hand "grabbed the back of her head and pulled it toward my waist and put my penis in her mouth." Despite noticing that T.F. tried to pull her mouth off of his penis, Taylor continued to move her head up and down. Then Griffin knocked on the door and asked to come in. Griffin came in and then "snatched her jeans from behind and started to fondle her." T.F. "pushed herself forward really hard and told [Griffin] to stop" and she was able to pull "her head away." T.F. "moved to her side really hard and kind of pushed [Taylor] toward the edge of the bed. [He] rolled off and got [his] clothes and left out the room and closed the door[.]" Several minutes later, he returned and opened the bedroom door where he saw Griffin "being forceful when he was holding [T.F.] down with his forearm." He observed it was "absolutely not" consensual. Taylor closed the bedroom door. He later saw the door open "hard and fast" and T.F. came out putting her clothes on quickly, she swore at Taylor and told him to lose her number.

¶12     Taylor testified that on the evening of the assault and several times in subsequent days, Griffin told him that he hoped he would not be charged with sexual assault. Four days after the assault, Taylor called T.F. to ask her to take him to the grocery store. The State then played, for a second time, the recording of the phone call that T.F. made to Taylor; Taylor identified his own and T.F.'s voices.

¶13    Taylor testified that after he was arrested and charged, he decided to cooperate with the State and testify against Griffin as part of a plea agreement. After he entered his guilty plea, Taylor and counsel met with Officer Kozlowski for a debriefing interview; Taylor then disclosed two letters he had received from Griffin after the incident with T.F.  He testified that he received one letter directly from Griffin's hand and he watched the second letter move from Griffin's hand to a third-party, and finally to Taylor.  Taylor read the first letter from Griffin aloud, part of which stated that they needed to "lean back and ride it out" and to request a speedy trial.  Taylor then read the second letter from Griffin aloud, part of which stated:

> I talked to my lawyer the other day, and he let me listen to the recorded phone call.  He said that there's a lot that I has got to play with, but he doesn't want the jury hearing it  ….  He also said it would be better to have separate trials, because that could mean that she would have to testify twice and it would be better if we withdrew the speedy trial because all this shit is still fresh in her mind  ….  We need to be on the same page.

¶14    The State then called Officer Kozlowski.  When the State asked him to review the procedures to put together a photo array, the trial court asked if "there [was] any challenge to the manner in which this array was put together?"  Trial counsel said no and agreed that the defense was "prepared to stipulate that the proper procedures were used here."  Officer Kozlowski explained that T.F. identified Taylor and Griffin in the photo arrays as her assailants.

¶15    The State called Officer David Stratton, who testified that while T.F. made the recorded phone call to Taylor on November 3, 2013, from the police station, he and another police officer waited outside of Taylor's apartment. Through an open window, Officer Stratton could hear that a man was speaking on the telephone at the time, and the officer had been told T.F. called Taylor.  He

clarified that he could not hear the contents of the conversation. Officer Stratton arrested Taylor and then Griffin, conducted a safety sweep of the apartment, and then conducted a search of the apartment after the search warrant was issued.

¶16    The State called Allison Lopez, the Sexual Assault Nurse Examiner (SANE) at Aurora Sinai Medical Center, who examined T.F. and prepared a report of her findings. The nurse examined T.F. for injuries to her vagina and anus, and took swabs for DNA.[3] She documented bruising on T.F.'s body on a chart and with photographs. She documented injuries to T.F.'s mouth and throat, which showed small hemorrhages under the surface of the skin, which she testified, "most likely … occurs from some type of blunt force trauma to the area."

¶17    The jury returned guilty verdicts on all three counts. In February 2015, the trial court sentenced Griffin to a total term of thirty-six years, divided as twenty-one years of initial confinement and fifteen years of extended supervision.

¶18    Griffin filed the underlying *pro se* motion for postconviction relief pursuant to WIS. STAT. § 809.30 (2019-20),[4] in April 2020. After ordering briefing, the trial court denied Griffin's motion in September 2020. Griffin moved for reconsideration, which the trial court denied in a second order.

¶19    Griffin appeals.

---

[3] An analyst in the Wisconsin State Crime Lab testified that the swabs either detected no male DNA or insufficient male DNA to develop a useful DNA profile to compare against Taylor or Griffin.

[4] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

**DISCUSSION**

¶20    Griffin makes three complaints.  First, Griffin argues that the State withheld **Brady** material by not providing the defense with a copy of the photo that T.F. found online on the Wisconsin Department of Corrections Sex Offender Registry (hereinafter Registry photo).  Second, Griffin argues that trial counsel provided ineffective assistance of counsel by not pursuing weather reports from October 30, 2013, to impeach T.F.'s testimony that she wanted to avoid tracking snow inside the apartment.  Finally, Griffin contends that the trial court erred when it admitted the letters Taylor claimed he received from Griffin because there was insufficient evidence to authenticate that Griffin wrote them.

¶21    Griffin seeks, at a minimum, an evidentiary hearing on his claims, a request denied by the trial court.  "A hearing on a postconviction motion is required only when the movant states sufficient material facts that, if true, would entitle the defendant to relief."  **State v. Allen**, 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433.  "Whether a motion alleges facts which, if true, would entitle a defendant to relief is a question of law that we review de novo."  **State v. Bentley**, 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996).  "[I]f the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief," the trial court has discretion to deny a postconviction motion without a hearing.  *See Allen*, 274 Wis. 2d 568, ¶9.  We review the trial court's decision to deny an evidentiary hearing under the erroneous exercise of discretion standard.  *See id.*

### I.     *Brady violation*

¶22     Griffin argues that the State committed a due process violation by not properly disclosing the Registry photo of Griffin that T.F. brought to the police to identify her assailant when she complained about the sexual assaults.  Griffin first argues that the photograph could not have been found in the way T.F. described; therefore, the preservation of the original photo would have allowed Griffin to impeach her testimony.  Next, he argues that because the photograph could not have been found, there is an inference to be made that T.F. only identified Griffin due to police suggestiveness.  Finally, Griffin argues that without the original photograph, he had no way to challenge the admissibility of the photo array procedures, because he theorizes, in essence, that the photo from the Registry and in the police photo array might have been the same image.

¶23     "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Evidence that impeaches or affects the credibility of a witness also "falls within this general rule."  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  "[T]he three prerequisites for a *Brady* violation [are] as follows:  'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *State v. Kevin Harris*, 2004 WI 64, ¶15, 272 Wis. 2d 80, 680 N.W.2d 737 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  "[A] *Brady* violation entails prejudice to the accused and necessarily entitles the defendant to a new trial."  *State v. Ronell Harris*, 2008 WI 15, ¶62, 307 Wis. 2d 555, 745 N.W.2d 397.  This court "independently

review[s] whether a due process violation has occurred, but we accept the trial court's findings of historical fact unless clearly erroneous." ***State v. Wayerski***, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.

¶24   We begin with Griffin's argument that T.F. could not have found the Registry photo in the way described in the record.[5]   Griffin asserts that the Registry photo was favorable evidence because he would use it to impeach T.F.'s credibility.  He contends that T.F. could not have found his photo on the Registry by searching for his first name and his zip code, therefore, the existence of the photo would impeach her testimony.   Griffin's postconviction motion was supported by two exhibits and an affidavit purporting to show that a person searching on the Registry for the first name "Ron" and the South Milwaukee zip code would not be able to find him.  In response, the State proffered an affidavit from the Director of the Registry, who attested that in 2013, a person searching the Registry could search by zip code, see all of the offenders, and then "find in that list all persons with a particular first name."

¶25   Griffin draws a distinction without a difference when he asserts that he could impeach T.F.'s identification of him by showing that the Registry could not be searched by first name and zip code in one step.  However, the record reflects that the same search could easily be accomplished in two steps.  T.F. did not testify about how she searched for Griffin—the characterization of her search

---

[5] According to the criminal complaint, T.F. told Officer Kozlowski that "[a]fter the incident, on a hunch, and using the name Ron and the South Milwaukee zip code, she went onto the sex offender website, and immediately recognized the defendant Ron Griffin's photo as being the second man at Taylor's residence on October 30, 2013."  At the preliminary hearing, Officer Stratton testified that "[T.F.] had looked into the Wisconsin database on sexual offenders and put in the–apparently put in the South Milwaukee zip code and looked up the name Ron and was able to identify a photograph of Ronald Griffin from that web-site."

found in the criminal complaint and in Officer Stratton's testimony at the preliminary hearing were based on second-hand sources and were characterizations of the search by someone other than T.F. She did not testify that she accomplished her search of the Registry for Griffin in one step. Although the trial court limited the parties from eliciting that the photo came from the Registry, Griffin trial counsel did not request to question T.F. about her search methodology, even within those confines, and did not cross-examine her about the issue at all.[6] Griffin has not established that the Registry photo would impeach T.F.'s credibility. Therefore, we conclude that Griffin has not shown that the Registry photo was favorable evidence.

¶26    Griffin next contends that without the original Registry photo T.F. brought to the police, he could not challenge the photo array procedures and the possibility that the photo used in the police photo array was the same as the Registry photo. However, the record reflects that Griffin expressly waived a challenge to the photo array procedures at trial. "[W]aiver is the intentional relinquishment or abandonment of a known right." *State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Griffin, through trial counsel, stipulated that he was not

---

[6] During the May 2014 pretrial hearing when the trial court considered Griffin's motion in limine to suppress evidence that T.F. found Griffin's photo on the Registry, the court questioned the State if it "intend[ed] to attempt to use in your case in-chief information that the victim researched the defendant and found his identity via the official state sex offender registry site?" The State responded "No." It stated an intention to "dance around that issue" and ask T.F. if she found the picture of Griffin "on the internet." The trial court asked Griffin's attorney (not the same counsel who represented Griffin at trial) if he objected. The attorney answered, "No. Clearly the jury can't hear that he is on the sex offender registry for purposes of this crime." The trial court then stated they were "all in agreement" that the State was not going to seek "to use that specific information" and tasked the State with instructing T.F. about the "limitations" of her description of where she found the photo.

challenging the photo array procedure. Because Griffin has waived this issue, we need not address his argument that because of flaws in the photo array procedure it is reasonable to infer that T.F.'s identification of Griffin was influenced by police suggestion.[7]

¶27 Even if we were to address Griffin's challenge to the photo array procedure on the merits, Griffin only offers conclusory arguments that the photo array was problematic because the Registry photo was not produced by the State.[8] His burden is to set forth the "who, what, where, why, and how" to demonstrate with "sufficient material facts for [this] reviewing court[] to meaningfully assess" his claim. *Allen*, 274 Wis. 2d 568, ¶23. Griffin fails to explain how the original photo would allow him to challenge T.F.'s identification in the photo array. He

---

[7] Further, we note that Griffin has not alleged ineffective assistance of counsel for waiving the photo array procedures; therefore, we will not analyze the issue under that standard. "We do not develop arguments for parties." *State v. Stewart*, 2018 WI App 41, ¶29, 383 Wis. 2d 546, 916 N.W.2d 188.

[8] At the preliminary hearing, Griffin's initial attorney, who withdrew and was replaced before trial, questioned Officer Stratton about the photos.

> [GRIFFIN'S INITIAL ATTORNEY:] Do you happen to know the photo that was used in the photo array is the same photo from the sex offender registry?
>
> [OFFICER STRATTON:] I can't say for certain.
>
> But we—The Officer that is putting those photo arrays together was taking them out of South Milwaukee Police Department booking photos. So I would say, likely not.
>
> [GRIFFIN'S INITIAL ATTORNEY:] Okay.
>
> [OFFICER STRATTON:] It would have been one of our booking photos.

Further, Officer Stratton testified that he was not involved in the photo array or interviewing T.F. at any point in the investigation.

fails to explain how the police unduly influenced T.F.'s identification of Griffin at the police station. He fails to specifically allege that the Registry photo was used in the photo array; instead, he asserts that he needs a hearing to resolve the issue because Officer Stratton was not "certain" that the images were different. Further, the record reflects that Officer Stratton immediately stated that the photo array would have been taken from South Milwaukee Police Department booking photos. At trial, Griffin's trial counsel did not ask Officer Kozlowski about the source of the photos for the photo array or whether the photo T.F. brought to the station was the same image as the one used in the photo array. Griffin only offers speculation that having the original photograph would allow him to challenge the photo array procedure and T.F.'s identification of Griffin. Ultimately, Griffin has not alleged sufficient material facts to convince us to order an evidentiary hearing despite the issue being waived.

¶28 We conclude that Griffin has not shown that the Registry photo was favorable to the defense. Therefore, we conclude that he has not shown that a *Brady* violation occurred. Griffin's arguments are conclusory. He has failed to demonstrate that an evidentiary hearing is required to investigate his claims. Accordingly, the trial court did not err when it denied his postconviction motion without a hearing. *See Allen*, 274 Wis. 2d 568, ¶23.

## II. *Ineffective assistance of counsel*

¶29 Griffin contends that trial counsel provided ineffective assistance of counsel because counsel did not pursue weather data for October 30, 2013, to impeach T.F.'s testimony that she took her boots off when she arrived at the apartment because of snow. The record reflects that trial counsel did cross-

examine T.F. about the weather and her removal of her boots. Griffin seeks a *Machner*[9] hearing to examine this claim.

¶30    To succeed on his postconviction motion, Griffin must allege sufficient material facts to satisfy the familiar two-prong inquiry to show ineffective assistance of counsel:  deficiency and prejudice.  ***Strickland v. Washington***, 466 U.S. 668, 687 (1984).  To prove deficient performance, a defendant must show specific acts or omissions of counsel that are "outside the wide range of professionally competent assistance."  ***Id.*** at 690.  To prove prejudice, a defendant must show that counsel's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome.  ***Id.*** at 687.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  ***Id.*** at 694.  We need not address both ***Strickland*** inquiries if the defendant fails to make a sufficient showing on either one.  *See **id.*** at 697.

¶31    The State argues that Griffin does not set forth what additional questions trial counsel should have asked T.F. about her boots and the weather. During cross-examination, trial counsel addressed the weather issue in these questions:

> [TRIAL COUNSEL:]  Did you state yesterday that it was snowing that day, October 30th of 2013?
>
> [T.F.:]  There was snow on the ground.
>
> [TRIAL COUNSEL:] Okay.  And you stated that you were wearing boots, correct?

---

[9] ***State v. Machner***, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (1979).

14

[T.F.:] Uh-huh.

[TRIAL COUNSEL:] And you stated that you took your boots off when you came in the apartment?

[T.F.:] Correct.

¶32 Griffin contends that weather data proving that there was no snow on the ground on October 30, 2013, would have allowed counsel to impeach T.F.'s credibility. The State contends that Griffin could not move to admit weather data without a witness to authenticate the weather report. In response, Griffin argues that the trial court could have taken judicial notice of the weather data, contending it was a government report.

¶33 We consider Griffin's claim through an analysis of prejudice. Even if trial counsel had obtained the historical weather data, found an expert to testify about it—or convinced the trial court to take judicial notice of the October weather data—and impeached T.F.'s statement that she wore boots because of snow on the ground, the result of the trial would not have changed. The evidence presented by the State was overwhelming. T.F. testified about two instances of anal sexual intercourse in which Griffin inserted his penis in her anus and one instance where Griffin attempted to insert his penis in her vagina. T.F. testified that she did not consent to any of these acts of sexual intercourse. Taylor testified that he saw Griffin engaging in sexual contact with T.F. that was "absolutely not" consensual. Her testimony that she removed her boots is not material or relevant to the question of who sexually assaulted her and how that assault happened. Impeaching T.F. about whether it was snowing or if there was snow on the ground would not have changed the outcome of the trial. Therefore, we conclude that Griffin has failed to show that trial counsel's performance prejudiced his defense.

Further, we conclude Griffin has failed to demonstrate sufficient material facts to be entitled to a *Machner* hearing on his claim of ineffective assistance of counsel.

### III. *Erroneous admission of evidence*

¶34 Griffin argues that the trial court erred when it admitted two letters purportedly written by Griffin and given to Taylor. The decision to admit or exclude evidence is an exercise of discretion by the trial court. *See State v. Ringer*, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448. We will sustain the court's decision unless it erroneously exercised its discretion. *State v. Hunt*, 2014 WI 102, ¶20, 360 Wis. 2d 576, 851 N.W.2d 434. An evidentiary error is harmless and not reversible unless the error "affected the substantial rights of the party" in light of the entire record. WIS. STAT. § 805.18(2). "In order for an error to be harmless, the State, as the party benefitting from the error, must prove that it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *State v. Nelson*, 2014 WI 70, ¶44, 355 Wis. 2d 722, 849 N.W.2d 317 (citation omitted). "The harmless error inquiry raises a question of law that this court decides." *State v. Stietz*, 2017 WI 58, ¶62, 375 Wis. 2d 572, 895 N.W.2d 796.

¶35 Griffin argues that the letters should not have been admitted because they were not properly authenticated. WISCONSIN STAT. §§ 909.01 and 909.015 provide the framework for authentication of evidence. Section 909.01 provides that "[t]he requirements of authentication or identification as a condition precedent to admissibility are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." One way to establish an evidentiary foundation is through the "[t]estimony of a witness with knowledge that a matter is what it is claimed to be." Sec. 909.015(1). Under Wisconsin law,

16

"authentication can be done through circumstantial evidence." *See* ***State v. Giacomantonio***, 2016 WI App 62, ¶20, 371 Wis. 2d 452, 885 N.W.2d 394.

¶36    Griffin argues that there was insufficient evidence to support the authentication of the letters.  He asserts that the only evidence supporting the letters authenticity was Taylor, who volunteered that the letters existed after entering into his plea agreement.  Griffin argues there was no corroborating evidence:  there was no witness other than Taylor who tied the letters to Griffin—the inmate who passed the second letter was not identified or named as a witness. The letters were not signed or dated.  There is no evidence in the record to support that Taylor recognized Griffin's handwriting.[10]

¶37    For our inquiry, we will assume without deciding that letters were erroneously admitted, and accordingly, we focus on whether this error was harmless—in other words, whether it is clear beyond a reasonable doubt that the error did not contribute to the guilty verdict.  *See* ***Ronell Harris***, 307 Wis. 2d 555, ¶113.

¶38    We review the evidence at trial to determine whether the admission of the letters undermine our confidence in the verdict.  T.F.'s testimony established the facts that satisfied the elements of each of the three counts of assaults.  The first count was first-degree sexual assault sexual contact, aided or abetted by one or more other persons, without consent, and by use of force.  T.F. testified that she went to Taylor's apartment on his invitation on October 30, 2013.

---

[10] Griffin further argued that the letters were prejudicial because they were passed in the jail, but the trial court carefully admitted the letters without letting the jury know about Taylor and Griffin's presence in jail at the time the letters were passed.  Therefore, because the jury did not hear about either man's presence in jail, no prejudice resulted.

T.F. testified that she went into a bedroom with Taylor and he began to assault her, and then Taylor told Griffin to enter the bedroom. T.F. fought against Taylor as Griffin pulled off T.F.'s pants and underwear and Griffin forcibly inserted his penis into her anus. The second count was for attempted second-degree sexual assault, penis-to-vagina sexual intercourse by use of force and without consent. T.F. testified after she struggled with Taylor, he left and she was alone with Griffin, who tried, but failed, to insert his penis into T.F.'s vagina. The third count was for second-degree sexual assault, penis-to-anus sexual intercourse by use of force and without consent. T.F. testified that she struggled with Griffin and he grabbed her and put his penis into her anus.

¶39    Additionally, the jury heard from Taylor, who testified about the non-consensual and forceful nature of the assaults as well as his actions that aided and abetted Griffin. Taylor testified that T.F. came over to his apartment at his invitation, and when he had her alone in a bedroom, he also allowed Griffin to enter the room. Griffin "snatched her jeans from behind and started to fondle her." Taylor testified that he struggled with T.F. and left the room. Several minutes later, he returned and opened the bedroom door where he saw Griffin "being forceful when he was holding [T.F.] down with his forearm." He observed it was "absolutely not" consensual.

¶40    Further, the SANE nurse testified that her examination of T.F. four days after the incident showed bruises on T.F.'s hands, arms and legs; and she reported that both her throat and her anus were very sore. The nurse documented injuries to T.F.'s mouth and throat, which showed small hemorrhages under the surface of the skin, which she testified, "most likely … occurs from some type of blunt force trauma to the area."

¶41    Even if we assume without deciding that the trial court erred in admitting the letters, we conclude any error was harmless because the evidence against Griffin was overwhelming and the admission of the letters did not affect Griffin's substantial rights.  *See* WIS. STAT. § 805.18.  It is clear beyond a reasonable doubt that the error did not affect undermine our confidence in the verdict.  *See **Ronell Harris***, 307 Wis. 2d 555, ¶113.  Accordingly, we conclude the trial court did not err when it denied Griffin's postconviction claim without a hearing.

## CONCLUSION

¶42    We conclude that Griffin has failed to show that the State committed a ***Brady*** violation by not obtaining and disclosing the Registry photo that T.F. brought to the police, and that Griffin has failed to demonstrate that trial counsel was ineffective for failing to pursue weather data to impeach T.F.'s testimony about snow on the ground.  We further conclude that even if assuming without deciding that the trial court erred in admitting the two letters, any error was harmless.  Accordingly, we conclude that Griffin has failed to demonstrate sufficient material facts to require an evidentiary hearing on any of his claims.  Finally, we affirm Griffin's judgment of conviction.

*By the Court.*—Judgment and orders affirmed.

Not recommended for publication in the official reports.

No.   2020AP1750(C)

¶43    DUGAN, J. (*concurring*).  I concur with the Majority's analysis of all of the issues except its analysis of the erroneous admission of evidence—two letters purportedly written by Griffin and given to Taylor.[1]  I conclude that the letters were sufficiently authenticated and properly admitted into evidence.[2]  Any challenge to the letters goes to the weight of the evidence not its admissibility. Thus, I would not address or join in the Majority's harmless error analysis that the Majority engages in.  *See* ***State v. Blalock***, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989).

¶44    I part ways with the Majority's opinion because they do not address whether the letters were admissible.  Rather, they address the issue by assuming without deciding that the letters were erroneously admitted and base their decision on their conclusion that any error was harmless.  I write separately because as noted, I conclude that the letters were sufficiently authenticated and were thus admissible.

¶45    In setting forth Griffin's arguments, I incorporate much of the Majority's summary of Griffin's arguments for ease of reading and analysis. Griffin argues that the letters should not have been admitted because they were not properly authenticated as a result of insufficient evidence to support the authentication of the letters.  He asserts that the only evidence supporting the

---

[1] The Majority's discussion of this issue begins at Majority, ¶34.

[2] Taylor testified that he received the first letter in November 2013 and the second letter in January 2014 from Griffin while they were both in the Milwaukee County Jail.

letters' authenticity was Taylor, who volunteered that the letters existed only after he entered into his plea agreement with the prosecutor. Griffin further argues there was no corroborating evidence that he wrote the letters. He states that Taylor was the only witness who tied the letters to Griffin—the inmate who passed the second letter was not identified or named as a witness. He also asserts that the letters were not signed or dated and that there was no evidence in the record to show that Taylor recognized Griffin's handwriting. He further argues that the "State could not tie the letters to Griffin in any way (whether by chain of custody-type evidence or otherwise) and could point to nothing to support a finding that Griffin wrote the two letters beyond Taylor's self-serving testimony." Thus, he argues that this court should find that the trial court should have excluded the two letters.

¶46 I reject Griffin's arguments for the following reasons. WISCONSIN STAT. §§ 909.01 and 909.015 provide the framework for authentication of evidence. Section 909.01 provides that "[t]he requirements of authentication or identification as a condition precedent to admissibility are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." One way to establish an evidentiary foundation is through the "[t]estimony of a witness with knowledge that a matter is what it is claimed to be." Sec. 909.015(1). Moreover, "authentication can be done through circumstantial evidence." *See State v. Giacomantonio*, 2016 WI App 62, ¶20, 371 Wis. 2d 452, 885 N.W.2d 394.

¶47 When reviewing evidentiary issues, "'[t]he question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of

2

record.'" *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (citation omitted). The trial court has "broad discretion to admit or exclude evidence." *See Giacomantonio*, 371 Wis. 2d 452, ¶17 (citation omitted). "This court will not disturb a [trial] court's decision to admit or exclude evidence unless the [trial] court erroneously exercised its discretion." *State v. Hunt*, 2014 WI 102, ¶20, 360 Wis. 2d 576, 851 N.W.2d 434. "This court upholds the trial court's decision to admit evidence 'if the [trial] court examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion.'" *Giacomantonio*, 371 Wis. 2d 452, ¶17 (citation omitted). Further, "[f]or a discretionary decision of this nature to be upheld, however, 'there should be evidence in the record that discretion was in fact exercised and the basis of that exercise of discretion should be set forth.'" *Pharr*, 115 Wis. 2d at 342 (citation omitted).

¶48     However, in this case, I note that at the time the trial court ruled that the letters were admissible, the trial court failed to set forth its reasoning in exercising its discretion to admit the letters. While the trial court was addressing Griffin's counsel's objection to the admissibility of the letters, Taylor's counsel clarified for the court that the letters were not sent through the mail. Rather, he told the court that the letters were passed between Griffin and Taylor while both were in the jail and that how it was done would be explained in detail if it was allowed. The trial court then stated, "So the court's ruling is this. The questions may be asked of Mr. Taylor from whom did you get these notes." The court then asked Taylor's trial counsel if he anticipated that Taylor was "passed these notes directly from Mr. Griffin?" Trial counsel responded that Taylor was on one side of the door between the jail pod and the gym and Griffin was on the other side and Griffin handed the note to a third inmate who slid it under the door to Taylor, all

within Taylor's view.[3]  The trial court then told the prosecutor that she had to craft a question for Taylor about how he received the letters that did not disclose to the jury that either Griffin or Taylor were in custody.

¶49   In its decision denying Griffin's postconviction motion, the trial court reiterated its statements that it made during the hearing on the objection to the admissibility of the letters as described above.  It then stated that "[t]he court stands by its admission of the letters, as well as its implicit ruling on the sufficient authentication of the letters."  The court then went on to add more details explaining why it held that the letters were admissible by quoting the language in WIS. STAT. § 909.015(1), (4), for the proposition that authentication conforming with statutory requirements may be established by the "'[t]estimony of a witness with knowledge that a matter is what it is claimed to be[,]' as well as by 'contents, substance … or other distinctive characteristics, taken in conjunction with circumstances.'"  The court then stated that "Taylor's testimony, including his reading of portions of the contents of the letters discussing trial strategy, meets the statutory requirements for authentication."

¶50   I conclude that the record, at the time of trial, does not show that trial court examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion at the time that it admitted the letters.  *See **Giacomantonio***, 371 Wis. 2d 452, ¶17.  In such circumstances our supreme court has held that "where the trial court fails to set

---

[3] Apparently trial counsel was addressing how the January letter was passed because that is what Taylor testified to at trial as to how he received the letter.  In a note that Taylor wrote to his trial counsel when Taylor mailed the November letter to counsel, Taylor wrote that he got the letter from Griffin who passed it under the gym door that connected their jail pods.

forth its reasoning in exercising its discretion to admit evidence, the appellate court should independently review the record to determine whether it provides a basis for the trial court's exercise of discretion." *Pharr*, 115 Wis. 2d at 343.

¶51     After reviewing the record, I conclude that the authentication of the two letters was established through circumstantial evidence. The circumstantial evidence of the timing and the content of the letters support a finding that the letters were written by Griffin. First as to timing, prior to Taylor entering into his plea agreement with the prosecutor, Griffin and Taylor were co-defendants in a single complaint facing a joint trial. Further, based on Taylor's trial counsel's statements to the trial court and Taylor's testimony during the trial, Taylor received the letters before he entered into his plea agreement on May 2, 2014, with the prosecutor. When Griffin's trial counsel objected to the admission of the two letters during the trial, Taylor's trial counsel advised the court that Taylor received the first letter directly from Griffin in the Milwaukee County Jail where they were both in custody in November 2013, and that Taylor watched Griffin hand the second letter to a fellow inmate at the jail, who then gave it to Taylor by sliding it under the door in January 2014.

¶52     During the trial when the State introduced the letters, Taylor testified that after he received the first letter from Griffin, he mailed it to his attorney with a short note and that the envelope was postmarked November 22, 2013.[4]  Taylor "wanted [trial counsel] to have it in his possession so it wasn't misplaced." The letter and envelope were produced and admitted into evidence at the trial. Taylor

---

[4]  The note was admitted into evidence at the trial and states in part, "I got this note from Ronald Griffin through the door, like I said his pod is right next to mine and we use the same gym so he passed this note under the gym door that connects our pods."

testified he received the second letter from Griffin in January 2014 and he personally handed the letter to his attorney shortly thereafter. I conclude that the timing of the letters—Taylor received them while Taylor and Griffin were co-defendants, in the jail in adjoining jail pods, awaiting a joint trial, and prior to Taylor entering into a plea agreement with the prosecutor, supports a finding that Griffin wrote the letters.

¶53    Further, I conclude that the content of the letters supports a finding that Griffin wrote the letters. The first letter from November stated in part:

> What they trying to break us? Ha, ha, they cant break no real stand up niggas, feel me? … [S]o fuck the Judge, fuck the d.a. and fuck any nigga that wanna ride with 'em! We good my nigga we just gotta ride it out and we need to get on that speedy trial <u>ASAP</u>. As soon as I see that lawyer Im tellin him to put in for a speedy trial—you do the same—I already know you on top of it. We got this we just need to lean back and ride it out … hit me back ASAP—you have gym tomorrow morning so lets do this—at 8:30 tomorrow morning slide your kite threw the door—Ill be watching for it so Ill get it … Ill grab it—just so we on the same page ….

The second letter from January stated in part:

> Aint shit too it on this end, Jus tryin to keep a cool head. I talked to my lawyer the other day and he let me listen to the recorded phone call—he said there is Alot he has can play with but he doesnt want the jury hearing it—he said he has Alot of positive shit to go on—<u>he said there is no dNA</u>. he Also said it would be better to have separate trials because that would mean that she would have to testify twice and it would be better if we withdrew the speedy trial and just went for a regular trial because all the shit is still fresh in her mind and the longer that passes the better because she will forget key points in her testimony—let me know what u think? we need to be on the same page, feel me? Im just letting u know everything that I know, feel me? the motion is called a severance motion for two separate trials—do u want to go to trial together or have separate ones? think about it and let me know? My lawyer told me in his 14 yrs being a lawyer he has never seen co-defendants not telling on each other—I said there Aint nothing to tell on and if

there was it Aint in our blood, feel me? he said us not saying shit will have a <u>huge impact</u> because the d.a. wont have much to go on with me and you not saying shit, feel me? all they have is her statement which Aint shit because she will get chewed up on the stand … I'll watch 4 u in the gym hit me back and let me know what it is.

¶54 The first letter told Taylor that they had "to ride it out and we need to try to get a speedy trial as soon as possible." It also recommended that Taylor ask his attorney to request a speedy trial. At a December 2013 hearing before the trial court, Griffin's trial counsel and Taylor's trial counsel each requested a speedy trial. In the second letter the trial strategy in the letter changed, telling Taylor that they should have "separate trials, because that could mean that [T.F.] would have to testify twice and it would be better if we withdrew the speedy trial because all this … is still fresh in her mind." The record reflects that in January 2014, Griffin's trial counsel moved to sever their trials, and the following month, Griffin's trial counsel moved to withdraw the speedy trial request. Based on the content of the letters that reflects that Griffin was suggesting to Taylor that they needed a united front in proceeding through the trial and discussed trial tactics,[5] I conclude that the circumstantial evidence supports a finding that Griffin wrote the letters.

¶55 I conclude that the letters were sufficiently authenticated and were thus admissible. Any challenge to the letters goes to the weight of the evidence

---

[5] As noted above, that in its postconviction written decision the court stated that authentication conforming with statutory requirements may be established by the "'[t]estimony of a witness with knowledge that a matter is what it is claimed to be[,]' as well as by 'contents, substance … or other distinctive characteristics, taken in conjunction with circumstances.'" The court then stated that "Taylor's testimony, including his reading of portions of the contents of the letters discussing trial strategy, meets the statutory requirements for authentication." I agree with the court's postconviction explanation for why it found the letters admissible.

not its admissibility. Thus, I would affirm on this ground and therefore, do not join in the Majority's harmless error analysis.