COURT OF APPEALS
DECISION
DATED AND FILED

May 7, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP968-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2021CF2150

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

RANDY KEITH SCOTT,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: J.D. WATTS, Judge. *Affirmed.*

Before Donald, P.J., Geenen and Colón, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Randy Keith Scott appeals from a judgment of conviction for one count of second-degree sexual assault of a child and one count of incest, and an order of the circuit court denying his postconviction motion for resentencing without a hearing. For the reasons set forth below, we affirm.

## BACKGROUND

¶2 Scott was charged with two counts of second-degree sexual assault of a child, two counts of incest, and one count of felony intimidation of a victim for conduct involving his twin daughters, Mindy and Mary.[1]

¶3 As alleged in the criminal complaint, Mindy and Mary came to live with Scott in December 2019, when they were fourteen years old. Shortly thereafter, Scott asked Mindy "'weird questions' about her virginity" and told Mindy that "he was going to 'test it out' with his 'tool.'" Scott subsequently secured birth control for Mindy.

¶4 Mindy described that Scott had penis to vagina intercourse with her on different occasions in his bedroom, on the couch in the living room, in the dining room, and on a blanket in the back of a van. He also engaged in oral intercourse with her on several occasions in his bedroom and in the dining room. She further stated that Scott made her send him pictures of her breasts and vagina,

---

[1] We adopt the pseudonyms used by the State. *See* WIS. STAT. RULE 809.86 (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

Additionally, we note that the criminal complaint contains factual allegations underlying counts three and four related to Mary. However, we limit our discussion to the factual allegations related to Mindy. The charges related to Scott's activities with Mary were eventually dismissed and read in for sentencing purposes, and the circuit court limited its discussion at the time of plea and sentencing to the factual allegations related to Mindy that underlie counts one, two, and five.

and Scott sent her pictures of his penis. Mindy stated that if she did not comply, Scott would storm out or threaten to commit suicide. Scott also displayed favoritism towards Mindy by making Mary do Mindy's chores, and Scott also paid Mindy $40 for "every time." Eventually, Mindy moved out of Scott's house to her grandfather's house, but the sexual activity continued.[2]

¶5      In April 2021, Scott's wife found a text message exchange between Scott and Mindy and pictures of Mindy on Scott's phone. When she confronted Scott, he prevented her from leaving the house, told her not to tell anyone, and suggested that "they should just pack up and run away." Scott also pointed a gun at his head and threatened to kill himself unless his wife told him where she saved a copy of the text messages and pictures.

¶6      After the confrontation, Scott took Mindy to a phone store where he attempted to change Mindy's phone number so she could not be found. Scott also took Mindy to a motel, where Mindy said they had sex because Scott told her "that he was stressed out and that they had to have sex in order to relieve stress." Police arrested Scott at the motel.

¶7      Following his arrest, Scott made several phone calls from the jail and attempted to reach Mindy to convince her to change her statement. For example, Scott made a phone call to an unidentified male subject and attempted to add Mindy as a three-way call to find out what Mindy told the police. After Mindy was not able to be added, Scott told the unidentified male subject, "[I]f she told them anything, she gotta keep her age at [fifteen] … if it's under fucking

---

[2] Mary stated that Scott "kicked [Mindy] out of the house when [Mindy] got a boyfriend."

[fifteen], it's going to be a felony. You know what I'm saying?" On a different phone call, Mindy told Scott that the police "know everything" and that she "told the truth." Scott became upset and stated, "Oh my fucking God," and another person on the phone call told Mindy that "[y]ou should have known better."

¶8 Mindy's grandfather eventually took Mindy to the police station, and Mindy told police that she lied in her statement and "all the sexual contact between her and the defendant" occurred after she turned sixteen years old and "nothing happened between them" when she was fourteen years old. However, Mindy also sent a Facebook message to her grandfather stating that she had been "raped over and over for two years."

¶9 Scott ultimately pled guilty to one count of second-degree sexual assault of a child and one count of incest as to Mindy. The remaining charges were dismissed and read in for sentencing purposes. Pursuant to the plea agreement, the State and trial counsel jointly recommended a sentence of fifteen years of initial confinement, with the length of extended supervision left to the discretion of the circuit court. The circuit court accepted Scott's pleas and proceeded directly to sentencing. The circuit court sentenced Scott to a total of forty-four years of imprisonment, composed of twenty-four years of initial confinement and twenty years of extended supervision.

¶10 Scott filed a postconviction motion requesting resentencing as a result of inaccurate information considered by the circuit court at the time of his sentencing. As alleged in the motion, the State made several remarks at the time of sentencing that Scott denied were true, and his employment record as considered at the time of sentencing was not accurate. The circuit court denied his motion without a hearing, and Scott now appeals.

**DISCUSSION**

¶11 On appeal, Scott argues that the circuit court erroneously denied his postconviction motion for resentencing as a result of inaccurate information considered at the time of sentencing. He contends that the circuit court was required to accept the factual allegations in his motion as true, and taking those allegations as true, he has shown that the circuit court actually relied on inaccurate information at the time of sentencing. Thus, he argues that he is entitled to a hearing on his claim for resentencing as a result of inaccurate information considered at the time of sentencing.

¶12 "A defendant has a constitutionally protected due process right to be sentenced upon accurate information." *State v. Tiepelman*, 2006 WI 66, ¶9, 291 Wis. 2d 179, 717 N.W.2d 1. "A defendant who requests resentencing due to the circuit court's use of inaccurate information at the sentencing hearing 'must show both that the information was inaccurate and that the court actually relied on the inaccurate information in the sentencing.'" *Id.*, ¶26 (citation omitted). We review *de novo* whether a defendant has been denied his due process right to be sentenced upon accurate information. *Id.*, ¶9.

¶13 In his motion, Scott identified the following statements made by the prosecutor at the time of sentencing: (1) "[T]here's threats both to the victim and threatening suicide, there's grooming and giving them money." (2) "The victim [Mindy] indicated that she moved out of [Scott's] house, that she was kicked out after she got a boyfriend[.]" (3) "[W]hile they were missing, the defendant [Scott] took her [Mindy] to a phone store and made her change her phone number so that, quote, no one could find them." (4) "[Mindy] said if she ever said no to him or asked him not to do it, he would threaten to kill himself[.]" (5) "His wife

indicated that he actually pulled out a firearm, pointed it at his head, threatened to kill himself, and then left the residence with the firearm. And that was when he and [Mindy] went missing, essentially." Scott then denied that the prosecutor's statements were true and that he does not believe that anyone ever made such statements. Scott further identified that he maintained continuous employment from the time of his release from federal prison in May 2014, and the limited employment record presented at the time of sentencing was inaccurate.

¶14     Importantly, we note that trial counsel never objected at the time of sentencing to the prosecutor's remarks or the employment record considered by the circuit court. If the defendant fails to object at the time the right is violated, the right may be forfeited. *State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612. We review *de novo* whether a claim is forfeited or adequately preserved for appeal. *State v. Corey J.G.*, 215 Wis. 2d 395, 405, 572 N.W.2d 845 (1998).

¶15     Forfeiture is failing to timely assert a right. *Ndina*, 315 Wis. 2d 653, ¶29. The forfeiture rule promotes fairness, efficiency, and the orderly administration of justice. *State v. Huebner*, 2000 WI 59, ¶¶11-12, 235 Wis. 2d 486, 611 N.W.2d 727; *see also Ndina*, 315 Wis. 2d 653, ¶30. We conclude that, as a result of trial counsel's failure to object, the fair, efficient, and orderly administration of justice requires application of the forfeiture rule here. Therefore, we conclude that Scott has forfeited his argument that the circuit court actually relied on inaccurate information at the time of sentencing.

¶16     Scott argues that "the forfeiture rule does not apply to previously unknown, inaccurate information first raised by the State at sentencing." *State v. Coffee*, 2020 WI 1, ¶31, 389 Wis. 2d 627, 937 N.W.2d 579. However, a review of

the criminal complaint and a review of the sentencing transcript plainly demonstrates that the prosecutor's remarks were taken directly from the factual allegations found in the criminal complaint. At the time of his plea and sentencing, Scott admitted to the contents of the criminal complaint and confirmed his own personal awareness and understanding of its contents. To be clear, the circuit court explicitly asked Scott if he read and understood the criminal complaint, and Scott replied, "Yes, sir." Similarly, Scott would have been personally aware of his own employment history at the time of sentencing. Therefore, the statements and employment history Scott identified in his motion simply do not fit the description of previously unknown information that the State raised for the first time at sentencing. Thus, we reject Scott's argument that the forfeiture rule cannot apply to his case.

¶17 Furthermore, we conclude that Scott's guilty plea waived his current challenge to the accuracy of the information considered at sentencing. "The general rule is that a guilty, no contest, or *Alford* plea 'waives all nonjurisdictional defects, including constitutional claims[.]'" *State v. Kelty*, 2006 WI 101, ¶18, 294 Wis. 2d 62, 716 N.W.2d 886 (footnote omitted; citation omitted).

¶18 As previously described, the prosecutor's remarks that Scott identified in his motion were clearly taken directly from the factual allegations in the criminal complaint. As part of his guilty plea, Scott specifically admitted to the facts alleged in the criminal complaint,[3] and he acknowledged that, as part of his guilty plea, he "gave up" certain trial rights, including the right to confront

---

[3] Indeed, trial counsel also stated during the plea and sentencing hearing that Scott admitted "that he engaged in reprehensible conduct" with Mindy.

7

"witnesses who would testify against him" and the right "to make the State prove [him] guilty beyond a reasonable doubt." Again, the circuit court specifically asked Scott if he read and understood the criminal complaint, and Scott replied, "Yes, sir." The circuit court even confirmed that Scott understood that "the [c]ourt can consider the facts and circumstances of Counts 3, 4, and 5 when doing the sentence" as part of the function of a read-in offense.

¶19 Thus, at the time of his guilty plea, Scott waived any right he had to challenge the accuracy of those facts alleged in the criminal complaint and test the credibility of the statements made by the witnesses contained in the criminal complaint. *See* **State v. Bratrud**, 204 Wis. 2d 445, 450, 555 N.W.2d 663 (Ct. App. 1996) ("In Wisconsin, appellate courts have concluded that various facts relevant to a defendant's conviction are admitted when a plea is taken.").

¶20 Rather, as opposed to raising an argument that the circuit court considered inaccurate information at the time of sentencing, we instead construe Scott's argument as a postconviction attempt to concoct a trial to dispute the statements made by Mindy, Mary, Scott's wife, and others that served as the basis of the factual allegations for his guilty pleas. *See* **State v. Merryfield**, 229 Wis. 2d 52, 61, 598 N.W.2d 251 (Ct. App. 1999) (recognizing that "the function of a trial," as opposed to a guilty plea is "to resolve factual disputes"). We reject his attempt to do so because, as a result of his guilty plea, Scott admitted to the facts contained in the criminal complaint and explicitly waived his right to confront the witnesses against him and test the credibility of the statements they made. Scott's guilty plea, therefore, precludes the particular argument he currently makes.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.